OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents a criminal procedure question of apparent first impression: Whether a court conducting a Wade hearing can consider the constitutionality of a stop which preceded the challenged identification in the absence of a defense motion made pursuant to Dunaway v New York (442 US 200 [1979])? If, as I hold below, the answer is yes, can the finding of an unconstitutional stop be extended to suppress evidence obtained after the defendant’s arrest, where no motion for a Mapp hearing has been made? Finally, was the police action in “forcibly stopping” the defendant based on adequate predicate knowledge to support the stop as required by the 4th Amendment? For the reasons discussed below, I find that it was not.
PROCEDURAL HISTORY
The defendant, Lonnie Perry (Perry) was indicted with a codefendant, one Damian Washington (Washington), for burglary in the third degree, grand larceny in the second degree, and criminal possession of stolen property in the third degree. Washington pleaded guilty before written motions were filed, and after Perry failed to appear in court, a bench warrant was issued. Shortly after Perry was involuntarily returned, appointed counsel and the Assistant District Attorney agreed, at a Bench conference before the Calendar Judge, that the defense would be given open file discovery and a Wade hearing without the necessity for written motions. In return, no Mapp hearing would be held. Some months later, still with no written motions ever having been filed, the case was sent to me for a Wade hearing, trial to follow. At that hearing, I found the following facts:
*432 FACTS
In the early morning of May 1,1984, a computer store located at West 57th Street between 8th and 9th Avenues was burglarized. At approximately 4:50 a.m., Police Officer Maselli, on patrol in an unmarked yellow cab, heard a radio run of two black males who were involved in the burglary.[1] He proceeded to the scene of the crime where he spoke to the doorman of the building in which the store was located. This witness gave him the additional information that the two men were wearing blue jeans and sneakers and had last been seen running west on 57th Street toward 9th Avenue.
Maselli then began to drive around the area until he reached 8th Avenue between 47th and 48th Streets, where he saw two black people wearing jeans and sneakers, walking south. One, a man, was carrying what Maselli believed to be a television set. The other appeared to be female. Maselli stopped the cab approximately 20 feet from them and approached, displaying his shield, while his partner approached from the other side. Without making any inquiry whatsoever, Maselli put the two up against the wall and, after discovering that the “television” which the male put down was actually a computer, placed both under arrest. The defendants were then taken to the crime scene where they were displayed to another witness, Linda Siegfried, who lived in an apartment above the store. After the witness identified them, defendants were taken to the station house and booked; a cord belonging to the computer which Washington had been carrying was recovered from Perry’s pocket.
In addition to these facts which I have found as true, Maselli testified to an incident prior to his initial arrival at the crime scene which allegedly connected Perry and Washington to the crime and “explained” his subsequent stop of them. Maselli told of seeing “two male blacks” turning into 8th Avenue from 54th Street, where they had been walking in an easterly direction. One of the men was carrying a television, and it was his recollection of the two which caused him to drive to a more southerly area of 8th Avenue after interviewing the doorman. Based on my assessment of his demeanor, his mode of telling his story, inconsistencies in the testimony and its inherent improbability, I find all his testimony concerning the prior sighting inherently incredible, and “patently tailored to nullify constitutional objections.” (See, People v Garafolo, 44 AD2d 86, 88 [2d Dept 1974].)
*433 Obviously, the story was important to explain Maselli’s later actions, and to connect the defendants to the crime. Since the burglars had last been seen heading west on 57th Street, their apprehension east of the crime scene, and some nine blocks south, had to be explained. The officer’s “recollection” of seeing their earlier approach to 8th Avenue from the west, on 54th Street, creates the logical link between the westward fleeing burglars and the defendants, and would substantially increase the predicate information available to the officer at the time of the arrest. Useful as the story might be, however, it does not ring true. First, the officer remembered virtually nothing else about the evening including even who his partner was. Yet the exact street and avenue location and direction of walking of two otherwise undistinguished men remain sharp in his memory. In addition, since Maselli, an experienced officer on anticrime patrol, knew other cars Were responding to the computer store, it is unlikely that he would have simply driven past two men carrying a television at 4:50 a.m. in a nonresidential area, when stores were not open for business.
CONCLUSIONS OF LAW
The legality of a stop depends on whether the predicate of information the police possess justifies the degree of intrusion which the stop entails; the various predicate/response tests are fully set forth in People v De Bour (40 NY2d 210 [1976]) where the court, tracking CPL 140.50, noted that a forcible stop, such as that which occurred here,[2] requires that the police have reasonable cause to believe that the person stopped has committed, is committing, or is about to commit a crime. This, of course, is greater than the predicate required to stop and inquire, where the police need only a justified suspicion that criminal activity is afoot.
Underlying these formally stated tests is a concern that the liberty and dignity of citizens should not be undermined without a real, articulable basis in fact, rather than hunch or mere generalized suspicion. Additionally, of course, the 4th Amendment protects citizens against arbitrary police action (see, e.g., United States v Brignoni-Ponce, 422 US 873 [1975]), in part out of concern that such action may be motivated by racial or other impermissible considerations. It is these fundamental guarantees of the 4th Amendment, as well as the test of Be Bour (supra) and its progeny, which were violated in the instant case.
*434 Believing that a burglary of a computer store had. been committed on West 57th Street by two male blacks who fled in a westerly direction, the police forcibly stopped what Officer Maselli believed, to be a male and female[3] black, carrying a television,[4] some 10 blocks away, and east of the burglarized computer store. They made no inquiry of other defendants before the forcible stop was effectuated, although neither Perry nor Washington behaved in a suspicious manner, nor attempted to flee when the police approached.
The description which Maselli had, involving only race, sex, blue jeans and sneakers was as sparse,[5] nonspecific and subject to mistake and abuse as is imaginable. There was no height, weight, physical disability, unusual clothing,[6] facial characteristics, nor anything else which would distinguish the perpetrators from any two other black males within 20 blocks.
A “bare description, without more,” such as suspicious conduct indicating the possession of a weapon, or attempted flight, “[will] not justify the highly intrusive conduct of the police [in stopping two defendants, requiring them to put their hands up, and frisking them]”. (People v Bezares, 103 AD2d 717, 718 [1st Dept 1984] [officer heard radio run of four male Hispanics with guns, one wearing a red and white shirt, one a blue shirt; of defendants, the only two male Hispanics in the vicinity, one was *435 wearing a blue shirt and jeans].) (Compare, e.g., People v Vincente, 100 AD2d 789 [1st Dept 1984], affd 63 NY2d 745 [1984] [the “description which matched the defendant (‘male, Hispanic, tan jacket’) is ‘almost non-specific on a street in Spanish-Harlem’ ”], with, e.g., People v Sustr, 73 AD2d 582 [1st Dept 1979] [defendant described as “a light-haired white man (in) a silver jacket * * * standing on a (specific street) corner (amid a group of other people)”].) Nor did the persons Maselli observed engage in any behavior, such as attempted flight, which might elevate his suspicion or increase his predicate knowledge. (See, e.g., People v Wilmer, 90 AD2d 918, 919 [3d Dept 1982]; People v Bezares, supra.) Finally, and most damning, in Maselli’s eyes Perry did not even match the gender of the burglars he was seeking.[7] Far from fitting the description given by the doorman, and heard on the radio run, Perry’s appearance directly contradicted it.[8]
On the facts as I have found them, Officer Maselli clearly lacked “reasonable cause” to believe that Perry had participated in the computer store burglary.
WAIVER
Since the stop was unconstitutional, both the subsequent showup identification and the computer cord constitute “fruit of the poisonous tree” which must be suppressed (e.g., United States v Crews, 445 US 463 [1980] [identification testimony]; Wong Sun v United States, 371 US 471 [1963] [physical evidence]), unless the failure to make the appropriate motions pursuant to Dunaway and Mapp constitutes a waiver of the unconstitutional behavior. I find that it does not.
CPL 255.20 (1) and (3) describe the procedure which criminal defendants must follow in seeking various forms of pretrial relief, including the suppression of illegally obtained evidence and statements. The statute was designed to combine fairness and constitutionality by not foreclosing motions if good cause *436 and the interests of justice require their resolution. At the same time, it was intended to encourage the speedy disposition of cases with “critical and sometimes unbending consequences” when excuses for failure to comply with statutory requirements fail to meet the good-cause requirement. (See, Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 255.20, p 440.)
In fact, the statute incorporates two separate standards which distinguish the reasons for which an appropriate motion was not timely made (e.g., People v Frigenti, 91 Misc 2d 139,141 [Sup Ct, Kings County 19773). Where no motion was made because the defendant was unaware of the grounds upon which it might have been made, consideration of the motion is mandatory if due diligence has been shown. (See, e.g., People v Loizides, 123 Misc 2d 334 [Suffolk County Ct 1984]; People v De Ruggiero, 96 Misc 2d 458 [Sup Ct, Westchester County 1978] [motions to dismiss indictment based on Grand Jury testimony not available until produced as Rosario material].) Late motions which do not fall within the due diligence test may nevertheless be considered “in the interests of justice and for good cause shown.” (Cf. People v Huelin, 85 Misc 2d 139 [Dist Ct, Suffolk County 1975] [motion to suppress statements made after response to motion for discovery and based upon information contained in the response].)
Because an underlying premise of the statutory scheme is to avoid trial delay based on last minute defense motions made solely for delay (People v Johnson, 112 Misc 2d 578, 579 [County Ct, Jefferson County 1982], constitutional claims made in untimely motions may be deemed waived where, for example, two omnibus motions were made, but defendant never moved for a hearing to determine the voluntariness of a statement he knew the prosecution intended to use against him. (People v Selby, 53 AD2d 878 [2d Dept 1976], affd 43 NY2d 791 [1977].)
Many factors — due diligence, good cause, deliberate delay and, of course, the possibility of a posttrial reversal for inadequate assistance of counsel[9] — must therefore be considered in determining when an untimely suppression motion may, should or must be considered on the merits.
*437 The instant case falls somewhere on the borderline between the mandatory and discretionary standards of the statute. While defense counsel knew that the People intended to introduce physical evidence seized from the defendant, had access to the radio run heard by the arresting officers, and also knew that defendant was a transvestite, it was not until Officer Maselli testified at the Wade hearing that the officer’s knowledge and understanding — critical to the determination of appropriate predicate/response — was revealed. Thus it is at least arguable that Maselli’s belief that he was arresting a female — like grounds first obtained through Rosario material — could not have been discovered until the officer actually testified at the Wade hearing.
Whether or not the present case comes directly within the mandatory standard, enough has been shown to meet the “good cause and interests of justice” test. Unlike those cases where waiver has been found (see, e.g., People v Selby, supra), there was no deliberate bypass here — the Dunaway motion was made immediately after Officer Maselli’s testimony. Since a hearing was already under way, no delay resulted from consideration and determination of the additional constitutional claims. Assuming arguendo, that waiver was found and a conviction obtained, the failure to make any written motions, although explicable in context, might well give rise to a postconviction claim of inadequate assistance and a possible reversal. Finally, having heard the evidence, I found that the defendant’s 4th Amendment rights were violated. Holding that violation “waived” by counsel’s failure to strictly comply with statutory time requirements would fail to vindicate society’s interest in constitutional police activity and would impose a double injustice on the defendant.
For all these reasons, I find that the failure to timely raise the constitutionality of the police stop in question does not waive determination of the Dunaway issue presented by this hearing and that, since the stop violated the 4th Amendment, the subsequent identification and evidence secured must be and are suppressed.

. Although the radio run was apparently far more detailed, Maselli remembered only this general description.

. [2] Immediately placing defendants “against the wall” was clearly a forcible interference with their liberty as well as a humiliation which undermined their human dignity. As such, it constitutes a forcible stop, notwithstanding the fact that the police did not have their guns drawn.

. There is other evidence which corroborates Maselli’s belief that Perry was a female. Linda Siegfried, the witness who made the showup identification, described the two people she saw outside the squad car as “a black fellow and a black girl.”

. In terms of the predicate which justified the stop, Maselli’s belief that the object carried by Washington was a television is a negative. Computer stores do not generally sell televisions, nor did Maselli say that he believed that the TV might have come from the computer store. At best, he may have believed that some other criminal activity was afoot — a belief which might well have justified asking the defendants for identification, or an explanation of their possession of a television in a nonresidential part of the city at 5:00 a.m. The “television” did not however, even apart from the gender difference, justify him in believing that these were the participants in the computer store burglary. It is well settled that what an illegal stop and search turns up cannot be used to retroactively justify the police’s actions.

. People v Boyd, 78 AD2d 225, 228 (1st Dept 1980), “We do not deal with sparse information from an unknown informer of questionable accuracy and reliability.”

. See, e.g., People v McLaurin, 56 AD2d 80 (1st Dept 1977), revd on dissenting opn 43 NY2d 902 (1978), where the defendant was described as unusually dressed and walking with a limp. See also, People v Bruce, 78 AD2d 169, 173 (1st Dept 1980) (two men outside particular location wearing a red and white striped “dashiki” and an orange shirt. “[T]he relative distinctiveness of the shirt colors minimized the likelihood of misidentification”).

. It is, of course, the officer’s belief at the time the stop is made, not what is discovered later, upon which the constitutionality of the stop must be judged. The subsequent determination that the suspect was a male transvestite, and not a female, does not change the fact that, as far as Maselli knew, he was stopping a woman.

. While one minor deviation from an otherwise fairly detailed description will not prove fatal (see, People v Boyd, supra [description was of two young black males, 14 to 16, the shorter wearing a brown leather jacket with a fur collar over a gray sweatsuit, the taller wearing a red ski jacket; one defendant matched the description of the taller robber precisely, the shorter, though the correct age and race, was wearing a blue ski jacket]), gender is a most basic identification; an error on this matter completely undermines the “reasonableness” of Maselli’s suspicion.

. The Supreme Court’s most recent inadequate assistance decisions in e.g., Strickland v Washington (466 US 668 [1984]) require a showing that, but for counsel’s unprofessional errors, the result of the proceedings would have been different. Without discussing or evaluating the circumstances of counsel’s failure to make written motions in the instant case, it is clear that, based on my findings and conclusions, the result is demonstrably different depending on whether or not the constitutional claims are deemed waived by his actions.