(March 14, 1996)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALEX M. VEGA, Also Known as LAURO Q. GARCIA, Appellant. [639 NYS2d 511] —Yesawich Jr., J.

It was established at trial that on the morning of July 18, 1991, the victim was traveling eastbound on Interstate Route 88 in Schoharie County, when her car became disabled and she pulled onto the road shoulder. Defendant, a truck driver, stopped and apparently offered to take the victim to secure gasoline or ether at a nearby convenience store. While at the store, the two were photographed by a surveillance camera and observed by witnesses. Shortly after noon that same day, the victim was found—blindfolded, bound and wrapped in a comforter—on railroad tracks beneath a Route 88 overpass in Broome County. Seriously injured, she was transported to a hospital where she died in surgery.

The victim's clothes were subsequently discovered in a dumpster at a truck stop in adjacent Tioga County. Assiduous investigation revealed that a truck driver matching defendant's description and driving a tractor-trailer from Okemos, Michigan, had used the victim's credit card to purchase gasoline at that truck stop at approximately 12:30 P.M. on July 18, 1991. Other purchases, using her credit cards, had also been made at several locations between Tioga County and Lansing, Michigan, during the period from July 18 to July 20, 1991. Ques-

tioned by New York State Police investigators on July 21, 1991, the owner of a trucking company in Okemos tentatively identified defendant from the surveillance camera tape as his employee. The next day, when defendant reported to the company office and turned in a gas receipt matching the purchase made in Tioga County, the New York investigators queried him about the victim's case, as well as a similar incident that had occurred near Ypsilanti, Michigan, earlier in the same month. Defendant admitted taking the victim to get gas—in gratitude for which, he asserted, she had given him her credit card—and having had consensual sexual intercourse with her, after which he allegedly returned her to her car and she drove away. He also admitted having had sex with the Michigan woman, but claimed that, too, was consensual.

Upon further questioning, defendant disclosed that he had more of the victim's credit cards at his home and made other inculpatory statements. He was arrested and a search warrant was obtained for his residence in Lansing. When the warrant was executed, additional incriminating evidence was detected. Ultimately convicted of intentional murder, felony murder, kidnapping, robbery, rape and sexual abuse, and sentenced to an aggregate term of incarceration of 44 years to life, defendant appeals.

Initially, we find defendant's criticism that he was not adequately informed of his *Miranda* rights (*see, Miranda v Arizona*, 384 US 436, 444) unjustified. Although State Police Investigator David McElligott did not read defendant his rights from a card, as is the usual practice, but recited them from memory, the warnings given by this experienced investigator were adequate and fully conveyed to defendant his rights. No more is required (*see, California v Prysock*, 453 US 355, 359; *People v Bartlett*, 191 AD2d 574, 575, *lv denied* 81 NY2d 1010). As for defendant's claims that the warnings did not apprise him of his right to consult with counsel, as opposed to merely having a lawyer present during questioning, and did not make it clear that an attorney could be appointed before questioning began, they are simply not borne out by the record. Similarly unconvincing is his assertion that he was not advised of his right to stop answering questions and request an attorney at any time; it is worth noting, in this regard, that he did precisely that, without further prompting, later in the afternoon.

And although defendant suggests otherwise, we do not view his brief periods of unresponsiveness during the officers' questioning as tantamount to an invocation of his right to counsel, or the statements he made during the interrogation as

being involuntary. Only an unequivocal request for an attorney triggers the right to counsel (see, People v Davis, 193 AD2d 1142). Significantly, here, as soon as defendant made such a request, the questioning ceased. As for the voluntariness of his statements, there is no indication that any activity on the part of the police, or other circumstance attending the questioning, was unduly coercive or otherwise improper (see, People v Anderson, 42 NY2d 35, 38; People v Jordan, 193 AD2d 890, 892, lv denied 82 NY2d 756; People v Padilla, 133 AD2d 353, 354, lv denied 70 NY2d 1009).

Defendant also maintains that County Court erred in denying his motion to suppress the evidence seized pursuant to the Michigan search warrants. The only issue respecting the validity of these warrants—which were executed at defendant's home in Michigan—meriting discussion is his claim that suppression is mandated because the warrants did not comply with certain technical requirements of the New York Criminal Procedure Law. Particularly, defendant contends that the warrants should have specified that they could only be executed between 6:00 A.M. and 9:00 P.M.,* should have been addressed to a police officer whose geographic area encompasses the county in which the search took place, and should have spelled out the name, department and classification of the officer who was to execute them (see, CPL 690.25 [1]; 690.45). There is, however, no compelling reason why evidence seized in another State, pursuant to a warrant procured in accordance with Federal constitutional requirements and the applicable laws of that State, should be suppressed (see, Echols v State, 484 So 2d 568, 571-572 [Fla], cert denied 479 US 871; People v Blair, 25 Cal 3d 640, 655-656, 159 Cal Rptr 818, 602 P2d 738; see also, 1 LaFave and Israel, Criminal Procedure § 3.1, at 147). Defendant certainly had no cause to expect that a search of his Michigan residence would comply with New York's procedural law and, more importantly, neither the core purpose of the exclusionary rule—deterrence of improper police conduct—nor New York's interests would be served by invoking it in these circumstances (see, Echols v State, supra, at 571-572).

The various evidentiary rulings made by County Court and assailed by defendant provide no justification for protest. In a comprehensive decision, the court found that the methods used to obtain the DNA evidence had achieved general acceptance within the scientific community, and because a proper foundation was laid, rightly admitted that evidence (see, People v Wes-

---

* Defendant does not contend that the warrant was actually executed at night, nor is there any indication that it was.

*ley*, 83 NY2d 417, 425). Defendant's arguments with regard to the statistical methods used for calculating the probability of a random match go to the weight of the evidence, not its admissibility (*see, supra*, at 427), and he was, accordingly, permitted to bring the perceived weaknesses in the People's methodology to the jury's attention when cross-examining the People's expert witness. As for the introduction of certain notes made by a technician—who, we note, defendant was apparently at liberty to call as a witness—during the laboratory procedure, these documents were properly introduced, as business records, to prove that the steps outlined therein were actually performed (*see, People v Farrell*, 58 NY2d 637, 638-639), thus rendering the technician's testimony unnecessary. Inasmuch as the supervisor who actually analyzed the films was subject to cross-examination with respect to his opinion and the validity of the basis therefor, including his representation that the protocol had been properly performed, defendant was not denied his right of confrontation.

To no avail also is defendant's challenge to County Court's ruling allowing a witness to whom defendant had remarked, several weeks prior to his encounter with the victim, that he could pick up a stranded female motorist "and rape her and kill her and nobody would ever know it", to recount that comment. The prejudice engendered by this testimony was clearly outweighed by its probative value, for it bore directly on whether defendant intended to kill the victim (which he had denied), a necessary element of the crime with which he was charged (*see, People v Jordan*, 193 AD2d 890, 893, *supra*). Neither was it error to admit, as an excited utterance, the victim's statement, made immediately after she was found below the overpass, that she had been raped (*see, People v Brown*, 70 NY2d 513, 519).

The remainder of defendant's arguments, including those directed at the sufficiency and weight of the uncommonly strong proof presented, and County Court's ruling with respect to evidence of the similar incident that had reputedly occurred in Michigan (which was held inadmissible), were either unpreserved for review or have been examined and found wanting (*see, e.g., People v Slater*, 173 AD2d 1024, 1026, *lv denied* 78 NY2d 974; *People v Sinclair*, 150 AD2d 950, 951-952).

Mikoll, J. P., Mercure, Crew III and White, JJ., concur. Ordered that the judgment is affirmed.