OPINION OF THE COURT
Martin E. Smith, J.
By notice of motion and affidavit dated September 26, 2000 and filed with the court on September 28, 2000 the defendant has sought suppression of physical evidence seized and any “leads or clues” derived from such evidence pursuant to CPL art 710.
The People filed their responsive affidavit in opposition to the motion dated November 20, 2000 on November 22, 2000.
The court declined to grant or deny the motion on the papers submitted, and a hearing was held on November 30, 2000 at which Officer William Haven of the Johnson City Police Department testified on behalf of the People and the defendant testified in his own behalf.
Findings of Fact
On April 5, 2000 at approximately 5:00 p.m., Officer Haven received a telephone call at the Johnson City Police Department from a confidential informant (Cl). The Cl was known to Officer Haven, who had received valuable and reliable information from him/her many times previously. Information the Cl had previously provided had led to many arrests for both misdemeanors and felonies.
The Cl advised that a black male known as “Rabbit” would be going to a 3rd floor apartment at 20 Willow Street, Johnson *155 City, to sell cocaine.[1] He further advised that “Rabbit” would be driving a reddish-brown Volvo. The officer and his partner, Officer Gregory Surowka, left the station to begin surveillance of 20 Willow Street, which is a few houses or buildings from the Johnson City Police Department, at 42 Willow Street. At approximately 5:15 p.m. they received a second telephone call from the Cl that the target was at work until 6:00 p.m. and would arrive shortly after that.
The officers had known from previous investigations dating back to February 2000 that a black male known as “Rabbit” was selling cocaine in Johnson City and owned a reddish Volvo. Officer Haven testified that their department had conducted controlled purchases of cocaine from “Rabbit,” although to date, they did not have a full name to associate with “Rabbit.” Officer Haven knew “Rabbit” by sight. They also knew that their “Rabbit” was employed and got out of work anytime between 6:00 and 8:00 p.m., and that he had moved from Johnson City and was living somewhere in Binghamton.
Officer Haven testified that he could not recall the basis of the Cl’s information. No evidence was offered either in the pleadings or at the hearing as to what in fact was the basis of the Cl’s information. Officer Haven candidly admitted, as was indicated in the police report, that the Cl may have obtained the information from someone else.
The Volvo arrived, pulling into the driveway at 6:14 p.m. The officers recognized the driver as the black male they knew as “Rabbit.” He was alone in the car.
Both officers were in plain clothes and wore their police badges suspended on chains around their neck, on top of their clothing. Their car was unmarked.
The officers approached — Officer Haven on the driver side, Officer Surowka on the passenger side — with their guns drawn and pointed at the defendant. Officer Haven saw in defendant’s left hand, simultaneous with his drawn gun approach to the defendant, a portion of a plastic bag. (No testimony was offered further describing what he saw.) He testified that he ordered him to drop it. Later testing established the bag did in fact contain cocaine. The entire transaction was over in a matter of seconds.
The defendant was transported the short distance to the police station, was arraigned shortly thereafter and released in *156 his own recognizance upon the recommendation of an Assistant District Attorney.
Conclusions of Law
“Probable cause for a warrantless arrest may be based on hearsay information, but only upon a showing that both the basis of knowledge and veracity components of the Aguilar / Spinelli test have been met” (People v DiFalco, 80 NY2d 693, 696 [citations omitted]). In this case, the People failed to meet their burden of proof with respect to the informant’s basis of knowledge. Thus, the court may not determine that there was probable cause to make a warrantless arrest, based upon the informant’s tip, and thereby deem the cocaine found pursuant to a search incident to a valid arrest.
Likewise, although the People argued at the hearing that “exigent circumstances” existed permitting the police to proceed in the fashion they did, it is equally clear that a valid search warrant for the defendant’s person or his car could not have been obtained based on the evidence as presented at the hearing, failing as it did to meet the Aguilar /Spinelli test as stated above. Since there was not a sufficient basis to obtain a warrant, the question of exigencies does not yet arise.
The question then becomes whether there was reasonable suspicion that a crime was being committed or about to occur, warranting any police intrusion, and at what level. The hearing evidence established the reliability of the informant. May his or her information, then, be treated differently from that of an anonymous tipster? “[T]here are situations in which an anonymous tip, suitably corroborated, exhibits ‘sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.’ ” (.Florida v J. L., 529 US 266, 270.) “Unlike a tip from a known informant.whose reputation can be assessed and who can be held responsible if [his or] her allegations turn out to be fabricated * * * ‘an anonymous tip alone seldom demonstrates the informant’s basis of knowledge or veracity’.” (Florida v J. L., supra, at 270.) In this case, the tipster is known to be reliable, but the source of his/her information is not so known and was not established. The information in this case, then, falls somewhere balanced between that information that meets the Aguilar / Spinelli level, and that merely anonymously provided. The court finds that upon seeing the man arrive in the reddish Volvo, and recognizing him to be the “Rabbit” they knew to be a drug dealer, and arriving at the predicted location (which they fairly could conclude from *157 their prior information was not his home), at the predicted time, was sufficient to establish a reasonable suspicion that a crime was being committed or about to occur. These predicted events are innocent or innocuous facts, but do suggest that the Cl had knowledge about the suspect, such as to credit his assertion that he was there to sell cocaine. As noted in Florida v J. L. (supra), facts such as these were presented in Alabama v White (496 US 325), which the Supreme Court “regarded * * * as borderline,” a “‘close case’.” (Florida v J. L., supra, at 271.) In other words, knowledge about a person’s future movements indicates some familiarity with that person’s affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. (Id.) In this case, however, the arrival of the Volvo with a black male (whom the police could not know was named “Rabbit” merely based on the informant’s tip) took on additional significance because the man was the man the police knew as “Rabbit,” from whom they had previously, in controlled buys, obtained cocaine. Thus, although the “reasonable suspicion” in this case is slim, the court finds it was present.
The People do not assert that the informant’s tip provided probable cause to make an arrest, but assert there was no arrest, simply a “forcible stop,” for which only “reasonable suspicion” was a necessary prerequisite. They cite numerous cases for the proposition that the employment of drawn guns by the police does not necessarily turn a street encounter into an arrest. A review of these cases, however, clearly distinguishes them both factually and analytically from this case.
In People v Murreld (185 AD2d 826), the officer testified at the suppression hearing that he observed a man draw a “large handgun” from his waistband and pass it to defendant. The police drew their weapons to stop defendant. The Court found that the officer’s observation constituted a sufficient, objectively credible reason for him to believe that criminal activity was afoot, and justified his response.
In People v Mateo (122 AD2d 229, 231), the Court said, “[W]e discern no impropriety in the officers’ display of their weapons during the stop, as the mere use of a weapon to effectuate a temporary detention is not improper where the circumstances indicate that criminal activity is afoot and the situation may be dangerous * * * The defendant’s suspicious conduct in watching the drug transaction while appearing to fidget with an item in his pocket, when combined with the reasonable inferences *158 which the officers could draw from the surrounding circumstances and the judicially recognized fact that the drug trade often engenders situations of extreme violence and danger to law enforcement officers [citations omitted], justified the display of police weapons in this case.” (Emphasis added.)
In People v Scott (197 AD2d 550), the police were in hot pursuit of armed bank robbery suspects pursuant to a radio dispatch. Given the information contained in the radio transmission they had received, and the defendant’s attempt to flee by scaling a tall fence, the court found the officers acted properly in drawing their weapons, ordering the defendant off the fence, and asking him where he was going. The court also found it was not unreasonable upon grabbing the defendant as he came down the fence, to retrieve the hard object (two-way radio) he felt in his waistband.
In People v Hardy (146 AD2d 800), a robbery and shooting had occurred five minutes earlier. The defendant and his companion met the description of the perpetrators and were within some two blocks of the crime when apprehended. Under the circumstances and in view of the furtive behavior of the two, the police had reasonable suspicion that defendant had committed, or was about to commit, a crime, justifying pursuit by the officers. “The arresting officer’s drawing of his gun as he approached the defendant did not convert the confrontation into an arrest, since this was a reasonable self-protective measure in light of the officer’s knowledge that at least one of the perpetrators of the crime under investigation was armed and dangerous.” (Supra, at 801 [emphasis added].)
In People v Chestnut (51 NY2d 14), police watched two men and a woman in a phone booth. One man left the booth, looked over his shoulder several times, turned and then looked back again toward the booth. Police next saw the man in a schoolyard hand something to another man. In the meantime, they received a report of a robbery that just occurred at a nearby intersection, which included a description of a man, armed with a silver gun. (The man they were watching fit the description.)
When the officers stopped him, they drew weapons and ordered him to lie on the ground to frisk him. The Court of Appeals said that, under the circumstances, the police acted reasonably in effecting this “stop and frisk.” In so deciding, the Court noted, “when the intrusion involved is of sufficient magnitude, an ‘arrest’ will be said to occur, whether or not the person is eventually transported to the police station and *159 charged with a crime. However, it is equally as clear that not every seizure constitutes an arrest. [Citation omitted.]” (People v Chestnut, at 20.) Given the particular facts and circumstances of this case, the presence of the drawn gun did not transform the stop and frisk of defendant into an arrest.
All these cases have one of two factors in common: the evidence established that the crime under investigation involved a weapon, and/or the conduct by the defendant sparking the police approach indicated reasonable suspicion that the defendant was armed. (In all these cases, whether the police chose to approach with drawn weapons or not, they were entitled to frisk the defendant.) Clearly, the potential presence of a weapon is the lynchpin of the reasonableness of the police conduct in drawing their own weapon. As stated in a slightly different context in People v Benjamin (51 NY2d 267, 271), where the police had received information that gunmen might be present, “it would be unrealistic * * * to assume the risk that the defendant’s conduct” (stepping backward and reaching for the rear of his waistband with both hands) “was in fact innocuous or innocent.” A police officer does not have to “await the glint of steel before he can act to preserve his safety.” By the same token, not every street encounter warrants or allows the police to approach a citizen with guns drawn. Indeed, a free society will not tolerate such. Under certain circumstances, such an approach will be deemed a seizure within the meaning of the 4th Amendment, mandating the suppression of evidence obtained as a result of the unlawful conduct. In the instant case, there was no testimony at the hearing that any of the prior encounters with “Rabbit” gave the police reason to suspect he was armed during the controlled buys, or that any violence or threat of violence accompanied those transactions. There was no testimony to the effect that they had ever received information from the earlier confidential informant that “Rabbit” ever carried a weapon. Likewise, there was no testimony that the confidential informant on April 5, 2000 gave any indication that his “Rabbit” was ever armed, or that he might be or would be on this occasion. Thus, notwithstanding the judicially recognized fact that the drug trade often engenders situations of extreme violence and danger to law enforcement officers (and the officer’s testimony of the “inherent danger” of drug cases), missing completely from the facts in this case is any basis for the court to conclude that the situation was or might be dangerous (People v Mateo, 122 AD2d 229, supra). Additionally, the evidence produced at the hearing clearly demonstrated *160 that the defendant was immediately handcuffed. There was no frisk or pat-down of the defendant before he was handcuffed.
Thus, the question of whether the police acted reasonably with respect to the initial encounter cannot be sidestepped. It must be remembered that the determination of whether the exclusionary rule will apply does not rest solely on whether there was reasonable suspicion to make a stop, but must necessarily take into account how the stop was effected, that is, did the police behave reasonably under the circumstances such that the stop will not be deemed a de facto arrest, requiring the suppression of the cocaine as the fruit of that unlawful arrest. Determining the reasonableness of police conduct pursuant to a street encounter requires “a weighing of the government’s interest against the encroachment involved with respect to an individual’s right to privacy and personal security.” (People v De Bour, 40 NY2d 210, 215.) This weighing process involves a consideration of “whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible” (supra, at 215; People v Torres, 115 AD2d 93). A seizure of the person for constitutional purposes has been defined as a significant interruption with an individual’s liberty of movement (People v Cantor, 36 NY2d 106, 111). Citizens have the right to be free from aggressive governmental interference. (See, People v De Bour, at 216.) “[A] policeman’s right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter.” (People v De Bour, supra, at 219.)
De Bour (supra), of course, sets forth four levels of intrusion. The People here urge the third level, that, having reasonable suspicion that a crime was occurring or about to occur, they could forcibly stop the defendant. The question is how to distinguish a permissible forcible Terry stop from an impermissible seizure, i.e., arrest. De Bour does not define “forcible stop” nor distinguish an arrest from one. However, a review of earlier and later cases warrants a conclusion that in approaching the defendant with guns drawn, without any objective basis in the record establishing that the defendant might be armed, the officers effectively seized the defendant within the meaning of our State and Federal Constitutions (US Const 4th Amend; NY Const, art I, § 12), for which probable cause was required and lacking. (See, People v Allende, 39 NY2d 474.) “Plain view” is *161 inapplicable; the discovery was not “inadvertent rather than anticipated” because the bag of cocaine was “discovered” as a result of the officer’s direction to the defendant to drop the bag.[2]
[3]That order, “drop the bag,” was a search within the meaning of our State and Federal Constitutions.
To the extent that People v Tirado (69 NY2d 863), People v Hicks (68 NY2d 234) and People v Allen (73 NY2d 378), relied upon by the People, do not address the question of whether there was reasonable suspicion to justify the stop, they are not on point. To the extent they address the question of when a detention is or is not a seizure (i.e., arrest), they are.
In People v Tirado (supra), the Court of Appeals remitted the case for determination of the factual question of when the defendant was handcuffed because that question was relevant to whether defendant’s statements and the cocaine found were the fruit of an illegal arrest. In the event the suppression court were to find that defendant had been handcuffed before his initial (incriminating) statement, the suppression motion should then be granted.® Not raised in that case was the question of whether the police acted reasonably in the approach they made of the defendant based on an anonymous tip.
People v Hicks (supra) likewise does not address the question of the lawfulness of the initial stop. That case found only that the police acted reasonably, after having lawfully stopped the defendant, in detaining and transporting him to the crime scene for possible identification as a permissible incident to the lawful stop. The defendant was not handcuffed.
In People v Allen (supra), the police received a report of an armed robbery in progress. The report described that each of the four perpetrators was armed with two guns apiece. The defendant and three other men were seen running away from the direction of the robbery. The officers exited their unmarked patrol car, identified themselves and approached the four men *162 for questioning. The four scattered and fled. With backup called, the defendant was apprehended scaling a wall in a dark alley. He was handcuffed. Immediately after being handcuffed, but prior to being questioned, he spontaneously admitted his complicity in the robbery. The Court of Appeals found that under the circumstances of this case, the handcuffing did not amount to an arrest. It held the police were entitled to handcuff the defendant to effect his nonarrest detention in order to ensure their own safety while they removed him to a more suitable location (from the dark alley) to pat him down for weapons. In other words, the application of handcuffs was not dispositive of whether the detention of a suspect on reasonable suspicion has been elevated into a full-blown arrest. This case clearly suggests that the gratuitous use of handcuffs, not warranted by any threat, or their prolonged use after the threat justifying the use of handcuffs in the first place, may be dispositive of that question. (There was a dissent.)
In People v Hicks (68 NY2d 234, 239, supra), referring to Dunaway v New York (442 US 200), and People v Yukl (25 NY2d 585), the Court notes, “[e]ven without a technical formal arrest, a suspect’s detention may in fact be the equivalent of an arrest, requiring probable cause.” No checklist has been devised to answer when a given set of circumstances equals an arrest. Neither subjective belief of the police nor that of the defendant governs. Citing the Yukl standard of “ ‘what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position,’ ” the Hicks Court noted that defendant was not handcuffed, there was no show of force, he was permitted to park his car, he was not taken to the station, the time was brief, he was told the purpose of his detention, and no questions were asked of him after the initial inquiry. (People v Hicks, at 240.)
As stated in People v Chestnut (supra, at 20), “[T]he concept of arrest should not be artificially limited by traditional notions so as to circumvent the probable cause requirement inherent in the constitutional proscription against unreasonable searches and seizures.” When a seizure is tantamount to an arrest, whether formal or de facto, it is reasonable only if supported by probable cause. (Dunaway v New York, 442 US 200, supra.)
Did the police act reasonably in their approach of Mr. Camber? Under Terry v Ohio (392 US 1) and CPL 140.50, they had a right to “forcibly” stop him to ask him his name and address, and an explanation of his conduct. (Here, the officer *163 testified that his intent was to stop the defendant to see if he would consent to being searched — whether at gunpoint or not is not entirely clear — and failing that, hold him until they could obtain a search warrant — which, as noted above, could not have been obtained based on the hearing evidence. Thus it is clear that the police officers intended to forcibly take the defendant into custody.)[4] In De Bour (supra, at 226) the police ordered the suspect to “freeze” and then frisked him — all without asking a single question. The defendant here was not frisked, but ordered to drop his bag — all without a single question being asked of him. Although the People urged exigency at the hearing, the hearing evidence is devoid of any evidence of a volatile situation or potential escape.
Given the facts as testified to at the suppression hearing, they would not have had a right to frisk him as a component of the stop. Thus, apart from the basis permitting the intrusion is the question of how the intrusion is conducted.
Cases finding a stop to have been a forcible stop relate scenarios far less intrusive than that in this case. In People v Perry (128 Misc 2d 430, 433, n 2), the court found that “placing defendants ‘against the wall’ was clearly a forcible interference with their liberty as well as a humiliation which undermined their human dignity. As such, it constitutes a forcible stop, notwithstanding the fact that the police did not have their guns drawn.”
In People v Boodle (47 NY2d 398), the Court found that evidence revealed as a direct consequence of unlawful police action is tainted and must be suppressed. In Boodle, the defendant entered the police car at the officer’s request. The Court found this may not have been coerced, but the officer’s command to “keep your hands where I can see them” demonstrated that his freedom of movement was significantly restrained. The Court further stated that when the officer began to drive without explanation, he substantially infringed on the defendant’s liberty. “Since prior to the seizure of the defendant the police wholly lacked evidence of probable cause linking him to criminal activity, the seizure was clearly unlawful.” (Boodle, at 401.) The gun, which the defendant in that case tossed from the car, was suppressed.
*164 Even allowing for the sake of argument that the police acted reasonably in approaching the defendant here with guns drawn, and that this did not amount to an arrest, the question remains whether they had a right, in the absence of probable cause, to order him to drop the plastic bag from his hand. The officer testified that he so directed the defendant to prevent him from ingesting it: clearly then he knew (more so than merely believed) that the object was not a weapon. Since they had no right to frisk, this conduct could not be justified as equivalent to a “frisk.” Since they had not made an arrest, it cannot be justified as a search pursuant to that arrest. He had no right to demand seeing the defendant’s parcel, as, lacking probable cause, he had no right to search. This demand amounted to a search within the meaning of the 4th Amendment, even if the stop did not amount to a seizure within the meaning of the 4th Amendment. This search, then, was not one made on probable cause, and so was unreasonable within the meaning of the 4th Amendment.
While it is tempting to distinguish the display of weapons in this case from the observation of the bag, and so arrive at probable cause to arrest and search (to preserve evidence), that approach flies in the face of the constitutional right of citizens to be free from unreasonable seizures, and neglects to hold true to the core purpose of the exclusionary rule: to deter unlawful police conduct (cf, People v Vega, 225 AD2d 890). To forcibly detain in the manner undertaken here, with no evidence that the situation was to be potentially dangerous, was unreasonable. The aggressive conduct of the police in this case is of the same kind which De Bour said cannot be condoned. (De Bour, 40 NY2d, supra, at 226.) Under the circumstances as testified to by the officer, there was no basis to approach with drawn weapons and seize the defendant as they did. That seizure was an impermissible one under both our State and Federal Constitutions. It was not made on probable cause, and the direction to drop his parcel, not made on probable cause, was an impermissible search.
The evidence is suppressed.

. No testimony was offered, and no arguments raised, that “sell cocaine” was determined to mean “to agree to sell cocaine” or that the defendant would physically be in possession of cocaine to deliver to another.

. There is insufficient evidence in the record for the court to find that the officer recognized the plastic he saw as a cocaine baggie, a hallmark of illicit drug trafficking packaging, such that the court could say that seeing the plastic, as the officer described it, was immediately apparent as evidence of criminality, elevating reasonable suspicion to probable cause to search. (See, People v Roth, 66 NY2d 688, 690.)

. It is clear from Tirado (supra) that if the cocaine had been found after the defendant was handcuffed, the suppression motion here would have to be granted. The result is, therefore, the same, as it is clear that the defendant here was handcuffed simultaneously, that is, the placing of handcuffs on the defendant was not the result of the officer seeing a bag on the ground he believed to be cocaine.

. Under De Bour (supra) and its progeny, if the suspect satisfactorily answers the questions and declines to consent to a search, there is no permissible basis to hold him. Likewise, there is authority that although the police have a right to detain him, he has a right to refuse to answer questions.