# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### JANUARY SESSION, 1999

FILED

February 17, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | No. 02C01-9708-CR-00318 |
| Appellee | ) | |
| | ) | SHELBY COUNTY |
| vs. | ) | |
| | ) | Hon. Carolyn Wade Blackett, Judge |
| DARRELL R. KENNEDY, | ) | |
| | ) | (Theft of Property over $1000, two |
| Appellant | ) | counts; Aggravated Rape) |

For the Appellant:

**Joseph S. Ozment**
Attorney at Law
369 North Main Street
Memphis, TN  38103

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Elizabeth T. Ryan**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

**William L. Gibbons**
District Attorney General

**Paul Goodman**
Asst. District Attorney General
Criminal Justice Complex
Suite 301, 201 Poplar Avenue
Memphis, TN 38103

OPINION FILED: _____

AFFIRMED IN PART; VACATED AND DISMISSED IN PART

**David G. Hayes**
Judge

**OPINION**

The appellant, Darrell R. Kennedy, was convicted by a jury in the Shelby Criminal Court of two counts of theft of property over $1,000[1] and one count of aggravated rape. He was sentenced as a range II multiple offender to six year sentences for each theft conviction and thirty-five years for the aggravated rape conviction. The trial court ordered the sentences for aggravated rape and theft under Count One to run consecutively. This effective forty-one year sentence was then ordered to run concurrent with his Count Two theft conviction.[2] In this appeal as of right, the appellant contends:

> I. The trial court's admission of expert testimony concerning the results of a DNA analysis violated his constitutional rights to confrontation; and
>
> II. The trial court's admission of testimony relating to a vehicle matching the description of the appellant's vehicle at the situs of the crimes during the week prior to the date of the instant offenses was irrelevant and, thus, improperly admitted.

After a review of the record, the appellant's convictions and sentences for aggravated rape and Count One theft of property are affirmed. However, the appellant's remaining conviction and sentence for theft of property in Count Two is constitutionally infirm under basic principles of double jeopardy. Accordingly, this conviction and sentence must be vacated and dismissed.

---

[1]The dates of the two thefts and the description of the property, "assorted jewelry," are the same under Counts One and Two. Both Counts of the indictment charge the same criminal offense. Tenn. Code Ann. § 39-14-103. The only distinction between the two is that Count One charges "did . . . knowingly obtain property" and Count Two charges "did . . . knowingly exercise control over property."

The State, in its brief, refers to the theft offense charged under Count One as robbery. While the proof at trial established the elements of aggravated robbery, the State chose to prosecute the crime as theft.

[2]These two sentences were also ordered to run consecutively to an outstanding twenty-five year sentence resulting from a previous second degree murder conviction for which the appellant was on parole at the time of the instant offenses. As a result, the appellant is currently serving an effective sentence of sixty-six years.

## Background

On November 24, 1992, two days before the Thanksgiving holiday, twenty-three year old Memphis State law student Ann Lightsey was working the 4:30 p.m. to midnight shift at the law library. At midnight, Ms. Lightsey locked the doors to the library and began her short journey home to her Georgian Woods apartment on Union Avenue. After entering her parking "space" at the apartment complex, she proceeded to her front door, leaving her purse and book bag in her vehicle due to the late hour. While she was attempting to unlock the door to her apartment, she heard footsteps approaching from behind. Someone then grabbed her hair, jerked her head back, and placed a gun against her temple. The assailant warned Ms. Lightsey not to scream; advising her that if she did, she would be shot. She was then instructed to open the door.

Once the door was unlocked, the assailant pushed Ms. Lightsey into the apartment and asked her where her roommate was. Ms. Lightsey responded that her roommate was visiting her boyfriend and that she expected her to come home "any minute." Thinking that the assailant would be deterred, Ms. Lightsey added that her roommate's boyfriend would be accompanying her home. Unswayed, the intruder asked for her purse and her money. In another attempt to persuade the intruder to leave, Ms. Lightsey informed him that her purse was in her car; she offered him her car keys and told him that he could have her car if he would "just leave." Ignoring the offer, the assailant led Ms. Lightsey to her bedroom, specifically to her dresser where her jewelry box was located. With the gun still aimed at her head, Ms. Lightsey was forced to go through her jewelry box, picking out only the "real stuff -- gold," as instructed by the assailant. Ms. Lightsey attempted to look at the assailant's reflection in the mirror over her dresser, however, he noticed her looking at him and warned her not to look at him or he would shoot her. Once he

3

was satisfied that he had obtained all of the valuable jewelry from the box, he then forced Ms. Lightsey to remove all of the jewelry from her person. The assailant took "all the jewelry that [she] could find and all [her] rings and watches." Ms. Lightsey later reported that the intruder had taken approximately fifteen pieces of jewelry, comprised of gold necklaces, rings, and two or three watches, valued at approximately $2500.

With the gun still aimed at her head, Ms. Lightsey was then led into the living room where the assailant forced her to lie on the floor with her face against the carpet. The assailant again told her not to look at him. He instructed her to remove her clothes. Frightened, Ms. Lightsey complied.

The assailant then forced his victim to perform oral sex upon him. Ms. Lightsey again attempted to look at her assailant. This time she was able to see his stomach and noticed that he "was a light colored black man." She was unable to observe his face because he was wearing a black or dark blue ski mask. The assailant also wore heavy winter gloves.

The assailant then instructed Ms. Lightsey to lie on the floor on her back at which time he penetrated her vagina with his penis. He asked her "if [she] had ever had sex with a black man and if [she] had a boyfriend." While still laying on the floor, the victim was sexually penetrated a second time. Throughout the entire rape, the assailant continuously kissed Ms. Lightsey on her cheek. When he ejaculated, the assailant did so on a towel that he had previously laid beneath the victim. He then wiped himself and the victim off with the towel. The assailant led Ms. Lightsey into the bathroom where he told her to douche, "to wash yourself out." In an effort to avoid destroying potential evidence, Ms. Lightsey pretended to douche as ordered.

4

The assailant again led Ms. Lightsey back into the living room where he asked her if she was going to call the police. He informed her that he was going to stay outside her apartment, watching to see if she called anyone. He unlocked the kitchen door, took the "telephone off the hook," and left the apartment. When the appellant left, he took the towel with him. Several minutes after her assailant's departure, Ms. Lightsey ran from her apartment to neighboring apartments seeking help. Eventually, a neighbor opened her apartment door and called "911."

When Memphis Police Officers arrived, Ms. Lightsey described her assailant as a fair-skinned black man, 5'10" to 6' tall, 160 to 175 pounds, and approximately 25-30 years old. She added that the masked intruder attempted to hide his height because he would "hunch over." At the subsequent trial, Ms. Lightsey testified that the appellant had the same characteristic type slouch as her assailant.

Between 2:00 a.m. and 3:00 a.m. that morning, Ms. Lightsey was taken to the Memphis Sexual Assault Resource Center where both vaginal and oral swabs were taken to determine the presence of sperm. Margaret Aiken, a nurse at the Center, testified that, although there was no trauma to the vaginal area, "moving sperm were present [up]on microscopic examination."

During the investigation of this case by Sergeant Bobby Napper, he discovered that several days before the crimes against Ms. Lightsey, Karen O'Kelley, a resident at the Georgian Woods Apartments, reported a suspicious vehicle in the parking lot. Specifically, she reported that, when she arrived home one evening, she observed a strange car in her parking place and she pulled directly behind the vehicle, preventing it from leaving. The vehicle was an older model Cadillac, bright blue in color, like a "blue M&M." Mrs. O'Kelley observed a "black man" sitting in the driver's seat of the vehicle. Mrs. O'Kelley wrote down the vehicle's license plate number. The following day, Mrs. O'Kelley reported the

incident to apartment manager Shirley Moses Cutliff, who turned the information over to the police.

In February 1993, the appellant was developed as a suspect in a jewelry store robbery in the Oak Court Mall. The officer in charge of this investigation was Sergeant George Maxwell. On February 12, 1993, with the assistance of Officers Tom Arnold and Corey Hale, Sergeant Maxwell arrested the appellant at his 435 Webster Street residence.[3] At the time of the arrest, the appellant was driving a 1978 bright blue Cadillac. The appellant's girlfriend, Thelma Baker, provided law enforcement officers consent to search the house. A search of the residence uncovered several items of jewelry. At this point, the appellant was not a suspect in the crimes against Ms. Lightsey.

During this same period, Sergeant Bobby Napper, the officer in charge of investigating the rape of Ms. Lightsey, was temporarily assigned to the robbery division. Sergeant Napper asked Sergeant Maxwell if he could look at the jewelry seized from 435 Webster. On February 20, 1993, Sergeant Napper contacted Anne Lightsey to examine items of jewelry recovered from the appellant's residence. Ms. Lightsey identified two items recovered as belonging to her. During a trip to Mexico, Ms. Lightsey had purchased a distinctive light blue stone and, upon return from her vacation, had had the stone mounted. Because of the irregular shape of the stone, the setting, which was made by a friend's father, was unusual in that the ring sat up high on the finger and the stone "was loose and it would kind of jiggle." Ms. Lightsey testified that she was "absolutely positive" that the ring belonged to her. The second ring was a gift from Ms. Lightsey's mother. The ring was silver and dome shaped with overlapping etching on the front. The ring, originally too small for her finger, had been stretched to fit. Because the metal was weak where it had been

---

[3]The robbery charge against the appellant was eventually dismissed because of misidentification and confessions by the true perpetrators.

6

stretched, the ring had been twice broken and had been repaired. The ring recovered from the appellant's residence had the breaks in the same place.

After Ms. Lightsey's identification of the jewelry, the appellant was arrested for the rape and theft. Sergeant Napper requested that the appellant provide body samples for DNA testing, however, the appellant refused. A search warrant was subsequently obtained to collect hair, blood, and saliva samples from the appellant. These samples along with the samples obtained from the victim at the Memphis Sexual Assault Resource Center were ultimately sent to the FBI DNA Analysis Unit in Washington, D.C. Special Agent John Quill led the team conducting the DNA analysis in this case. The analysis revealed that, in all four locations observed, the DNA from the vaginal specimen taken from Anne Lightsey matched the appellant. Specifically, Special Agent Quill concluded that "the chance of an unrelated individual at random in the population having a profile at all four of these locations matching that of [the appellant] is one in nine million in the Black population, one in two million in the Caucasian population, and one in one million in the Hispanic population." Thus, he concluded that the DNA profiles match those of the defendant to a reasonable degree of scientific certainty.

In his defense, the appellant presented the testimony of Thelma Baker. Ms. Baker testified that she owned a barber shop/boutique called "Bare Essence." To obtain merchandise for her business, she and the appellant often frequented jewelry shows. She stated that she and the appellant had attended one such jewelry show on January 30 through February 2, 1993, at the Cook Convention Center.

The appellant took the stand in his own defense. He adamantly denied committing any of the offenses for which he was charged. When asked whether he recognized the rings that Ms. Lightsey had identified as those taken from her apartment, he stated that he had purchased the two rings at the Cook Convention

7

Center at two different jewelry shows. Specifically, he testified that he had purchased the blue stone ring at the February 1993 jewelry show and the silver dome ring at a jewelry show held prior to November 25, 1992, the date of the present offenses. The appellant explained that he had "cut this ring to put on [Baker's] finger so she could fit her finger." Despite this assertion and his claim that he and his girlfriend retained receipts for all of their jewelry purchases, the appellant was unable to produce any such receipt for either ring at trial. The appellant admitted that he owned a bright blue 1978 Cadillac with a "peanut butter color" custom top. Although he stated that he did not purchase the Cadillac until December 1992, he conceded that he had driven the automobile on several occasions prior to the purchase.

Based upon this evidence, the jury convicted the appellant of one count of aggravated rape and two counts of theft of property over $1000.

## I. Right to Confrontation

### A. Background

Special Agent Quill, assigned to the DNA Analysis Unit of the FBI laboratory, testified on behalf of the prosecution as an expert "in the field of DNA analysis and identification."[4] He explained in detail the FBI's procedures for testing and analyzing DNA samples, as well as defining the quality controls in place at the FBI laboratory. Special Agent Quill summarized the procedure[5] utilized by the FBI laboratory in seven simple steps:

---

[4]Agent Quill's testimony revealed that he is a twenty-four year veteran of the FBI and, in 1989, was assigned to the DNA Analysis Unit of the FBI Laboratory. He holds a Bachelor's Degree in biology and a Master of Forensic Science Degree from George Washington University. He has testified approximately 125 times as an expert in the field of DNA analysis and identification.

[5]The procedure utilized by the FBI laboratory is known as the Restriction Fragment Length Polymorphism (RFLP) method of DNA analysis. Although the specifics of the procedure are abbreviated in the present case, this court provided a thorough and comprehensive explanation of the RFLP method in State v. Chapman, No. 01C01-9604-CC-00137 (Tenn. Crim. App. at Nashville, Sept. 30, 1997), perm. to appeal denied, (Tenn. May 11, 1998).

(1)  DNA is extracted from the cellular material, *e.g.*, the blood or semen sample.

(2)  The DNA is cut into fragment lengths.

(3)  The fragments are placed in a gelatin-like substance, agarose, and a negative charge is run through the gel, causing the DNA to migrate to the positive side.

(4) The DNA is transferred from the gel to a nylon membrane.

(5) The membrane is placed into a solution with pieces of DNA that give off light.  The DNA fragments will migrate to a specific location of interest, attaching themselves to that location on the membrane.

(6)  The membrane is cleaned of any residual material and is placed between two sensitive pieces of x-ray film.

(7)  The film is developed and the supervising agent interprets, both visually and with the assistance of a computer, the resulting autorads developed from the DNA samples from the suspect and the forensic sample taken from the victim.

Special Agent Quill testified that he was the agent assigned to the present case and he personally allocated the laboratory number 30311060 to the samples received.   He conceded on cross-examination that he personally did not prepare the samples for evaluation, rather the mechanical preparation of the autorads was conducted by his laboratory technician, whose work he evaluated.  Notwithstanding the mechanical procedures performed by the technician, Special Agent Quill testified that "[he] is responsible for the case," "[he] determines what specimens will be run," and that "[he has] safeguards for each phase of the test that [he] review[s] to insure that was done and done correctly."   Special Agent Quill also explained that the procedure utilized by the FBI is self-validating, *i.e.*, "if there are any other bands in the cell line control, I will not interpret the work because something is wrong.  The probe is contaminated."

The appellant, in his initial assignment of error, argues that his constitutional guarantee of the right of confrontation was violated by admission into evidence of the results of the DNA profile test through the testimony of Special Agent Quill, the

laboratory supervisor, instead of through the laboratory technician who actually performed the mechanical aspects of the analysis procedure.

### B. Analysis

The Constitution of the United States provides the accused in a criminal prosecution the right "to be confronted with witnesses." U.S. CONST. amend. VI. The Tennessee Constitution provides the right "to meet witnesses face to face." TENN. CONST. art. I, § 9. The import of these guaranties is threefold:

> (1) to have the witness testify under oath and subject to the penalties for perjury;
> (2) to enable the fact-finder to observe the manner or demeanor of the witness and assess his or her credibility; and
> (3) to have the witness available for cross-examination.

See Ohio v. Roberts, 448 U.S. 56, 63-64, 100 S.Ct. 2531, 2537-38 (1980) (internal quotation omitted); California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935 (1970); State v. Hughes, 713 S.W.2d 58 (Tenn. 1986). Notwithstanding these objectives, courts have been quick to recognize that there are competing interests that may warrant dispensing with confrontation at trial. Ohio v. Roberts, 448 U.S. at 63-64, 100 S.Ct. at 2537-38. In other words, the right of confrontation is not absolute and must occasionally give way to considerations of public policy and necessities of the case. See Jenkins v. State, 627 N.E.2d 789, 793 (Ind. 1993). Thus, the United States Supreme Court has repeatedly refused to apply a literal interpretation of the Confrontation Clause as doing so would bar the use of any out-of-court statements (hearsay) when the declarant is unavailable, creating extreme and unintended results. Idaho v. Wright, 497 U.S. 805, 814, 110 S.Ct. 3139, 3145 (1990); see also Sherman v. Scott, 62 F.3d 136, 140 (5th Cir. 1995), cert. denied, 516 U.S. 1180, 116 S.Ct. 1279 (1996).

The Tennessee Supreme Court has previously had occasion to address the standards and criteria that must be met in order for out-of-court statements to satisfy the Confrontation Clause of both the Sixth Amendment of the United States

10

Constitution and Article I, Section 9 of the Tennessee Constitution. See State v.

Armes, 607 S.W.2d 234, 236 (Tenn. 1980); State v. Henderson, 554 S.W.2d 117

(Tenn. 1977). In State v. Henderson, our supreme court recognized that valid

claims of an unconstitutional abridgement of the right to confront witnesses arise

when:

> (1) the hearsay evidence is crucial to proving the State's case, *i.e.*, the evidence is offered to prove an essential element of the crime or it connects the defendant directly to the commission of the crime;
>
> (2) there is no proof that the witness is unavailable, *i.e.*, the State must make a good faith effort to secure the presence of the person whose statement is to be offered against the defendant; and
>
> (3) the hearsay evidence is lacking its own indicia of reliability.

Henderson, 554 S.W.2d at 120. See also Armes, 607 S.W.2d at 237; State v.

Oody, 823 S.W.2d 554 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1991);

State v. Carpenter, 773 S.W.2d 1 (Tenn. Crim. App. 1989); State v. Arnold, 719

S.W.2d 543 (Tenn. Crim. App. 1986). Cf. Stewart v. Cowan, 528 F.2d 79 (6th Cir.

1976).


Notwithstanding the constraints imposed by the Henderson tripartite test, the

United States Supreme Court has held that a demonstration of availability (part 2 of

the Henderson test) is not always required. Ohio v. Roberts, 448 U.S. at 65, n. 7,

100 S.Ct. at 2538 n. 7; Sherman v. Scott, 62 F.3d at 140. Indeed, in White v.

Illinois, 502 U.S. 346, 354, 112 S.Ct. 736, 741 (1992), the Court held that Ohio v.

Roberts stands for the proposition that unavailability analysis is a necessary part of

the Confrontation Clause inquiry only when the challenged out-of-court statements

were made in the course of a prior judicial proceeding. Moreover, our supreme

court has also recognized that "firmly rooted exceptions to the hearsay rule do not

violate the Confrontation Clause."[6] See State v. Causby, 706 S.W.2d 628, 631

---

[6]Tennessee is not alone in providing this exception to the criteria deemed necessary to satisfy the Confrontation Clause. See Bourjaily v. United States, 483 U.S. 171, 182-183, 107 S.Ct. 2775, 2782-83 (1987); Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. at 2539; United States v. Roulette, 75 F.3d 418, 422 (8th Cir. 1996), cert. denied, -- U.S.--, 117 S.Ct. 147 (1996); United States v. Baker, 855 F.2d 1353, 1359 (8th Cir. 1988), cert. denied, 490 U.S. 1069, 109 S.Ct. 2072

(Tenn. 1986); see also State v. Hester, No. 03C01-9704-CR-00144 (Tenn. Crim. App. at Knoxville, June 4, 1998) (citing State v. Alley, No. 02C01-9405-CC-00100 (Tenn. Crim. App. at Jackson, June 18, 1997), perm. to appeal denied, (Tenn. Mar. 2, 1998); State v. Lillard, No. 01C01-9602-CC-00051 (Tenn. Crim. App. at Nashville, Feb. 12, 1997)).  The rationale for this principle is based upon the premise that some forms of admissible hearsay rest upon such solid foundations that admission of virtually any evidence within them comports with the right of confrontation. See Ohio v. Roberts, 448 U.S. at 66, 100 S.Ct. at 2539; Causby, 706 S.W.2d at 631 (Tennessee Supreme Court holds that former testimony hearsay exception is such firmly established rule and so inherently reliable that any such evidence necessarily comports with right of confrontation.). [7]  Indeed, statements admitted under a firmly rooted hearsay exception are so inherently trustworthy that adversarial testing would add little to their reliability.   In other words, a hearsay exception will satisfy the Confrontation Clause if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility. Idaho v. Wright, 497 U.S. at 820, 110 S.Ct. at 3149.

In the present case, the testimony of Special Agent Quill was clearly admissible under Tenn. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Rule 703, Tenn. R. Evid., contemplates three possible sources from which an expert may base his/her opinion:  (1) information actually perceived by the expert; (2)

---

(1989). But see  Barnes v. State, 704 So. 2d 487, 494-496 (Ala. Crim. App. 1997) (introduction of lab report without requiring presence of technician who wrote report violated both Due Process Clause and Confrontation Clause);  State v. Clark, 964 P.2d 766, 770-772 (Mont. 1998)(introduction of lab report without requiring presence of technician who wrote report violated both Confrontation Clause and Due Process Clause).

[7]In Causby, 706 S.W.2d at 631, the Tennessee Supreme Court held that the third prong of the Henderson-Armes requirement for complying with the confrontation clause, i.e., that the evidence not be crucial or devastating, is not required in the case of well established hearsay exception such as former testimony. Id. at 631, note 1 (citing Mancusi v. Stubbs, 408 U.S. 204, 92 S.Ct. 2308 (1972) and Ohio v. Roberts, 448 U.S. at 56, 100 S.Ct. at 2531).

12

information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field. See Tenn. R. Evid. 703; see also NEIL P. COHEN, ET. AL., TENNESSEE LAW OF EVIDENCE §§ 703.2, 703.3, 703.4 (3d ed. 1995).

Clearly, Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. See Tenn. R. Evid. 703. Indeed, it is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence, but are reliable. See NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 703.4. In determining the reliability of the underlying information, that underlying data must be such that experts in that field reasonably rely on them in forming the same kinds of opinions or inferences that the expert in this case did. Id. Thus, Tenn. R. Evid. 703 provides that an expert may base an opinion upon clearly inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in that situation.

In the case before us, the laboratory technician's participation was limited to the mechanically objective preparatory procedure required for Special Agent Quill's ultimate interpretation and analysis of the autoradiographs. Quill checked the computations of the technician and verified that the technician would have followed the standard laboratory procedures. See, e.g., Sherman v. Scott, 62 F.3d at 142. Furthermore, Quill explained that the procedures are generally accepted within the scientific community as reliable and that the resulting autoradiographs are self-validating, *i.e.*, if an error would have occurred during the preparatory phase, Quill would not have been able to complete his analysis. Special Agent Quill was justified in his reliance on the preparatory procedures performed by the laboratory technician. The laboratory reports contain the particularized guaranties of trustworthiness to keep them from violating a defendant's rights under the

Confrontation Clause. Additionally, the defense was able to thoroughly cross-examine Special Agent Quill as to the samples, procedures, safeguards, and results reached in the present case. Special Agent Quill's testimony was properly admitted under Tenn. R. Evid. 703 and in no way violated the appellant's right to confrontation. Accord Gray v. State, No. 96-DP-00241-SCT (Miss. Aug. 6, 1998) (defendant's confrontation rights were not violated by admission of DNA expert's testimony even though some portions of testing were conducted by other persons in expert's laboratory; expert was individual who evaluated autoradiographs and did sizing procedure); State v. Daughtry, 459 S.E.2d 747, 758-59 (N.C. 1995) (testimony of Special Agent regarding results of DNA testing did not violate defendant's right to confrontation although another agent actually performed DNA analysis under witness' direct supervision; witness reviewed agent's final reports, rendering report inherently reliable and allowing testifying Agent to use it to form his opinions); State v. Futrell, 436 S.E.2d 884, 892 (N.C. App. 1993); State v. Hutto, 481 S.E.2d 432, 434-35 (S.C. 1997) (confrontation clause does not forbid reliance at trial by experts upon material prepared by others). Cf. United States v. Smith, 869 F.2d 348, 355 (7th Cir. 1989). Accordingly, we conclude that the admission of an expert's opinion based on hearsay evidence not in itself admissible does not violate the Confrontation Clause of either the United States nor the Tennessee Constitutions so long as the expert providing the opinion is available for cross-examination.[8]

---

[8]We note that many state and federal courts have admitted testimony similar or analogous to that admitted in the case *sub judice* under a Confrontation Clause challenge based upon the ground that the "business records" exception is such a firmly established and well-rooted exception that no violation of the Confrontation Clause would occur. See, e.g., United States v. Ismoila, 100 F.3d 380, 392 (5th Cir. 1996), cert. denied, -- U.S. --, 117 S.Ct. 1712 (1997); Minner v. Kerby, 30 F.3d 1311 (9th Cir. 1994) (introduction of chemist's notes through supervisor not violative of Confrontation Clause); United States v. Baker, 855 F.2d at 1360 (business records exception, is firmly rooted hearsay exception to prevent violation of Confrontation Clause); Reardon v. Manson, 806 F.2d 39 (2d Cir. 1986), cert. denied, 481 U.S. 1020, 107 S.Ct. 1903 (1987) (chemist report introduced through testimony of supervisor properly admitted sufficient indicia of reliability); People v. Vega, 639 N.Y.S.2d 511, 513-514 (A.D. 3 Dept. 1996) (introduction of technician's notes under business records exception rendered technician's testimony unnecessary where supervisor actually analyzed samples); State v. Fontenette, No. 59014 (Ohio App. Sept. 19, 1991) (testimony by laboratory supervisor regarding DNA profile properly admitted under business records exception did not violate Confrontation Clause).

Notwithstanding the apparent acceptance of utilizing this hearsay exception, this court is reluctant to apply the business records exception to the testimony at issue in the present case.

## II. Admissibility of Testimony

### A. Background

The appellant argues that, because no evidence was ever introduced connecting the blue Cadillac observed by Mrs. O'Kelley to the appellant's blue Cadillac, this testimony was irrelevant and prejudicial. Moreover, because the State failed to have Mrs. O'Kelley identify the slip of paper upon which she transcribed the license plate number, Mrs. Cutliff and Officer Maxwell were allowed to testify to hearsay information. The appellant complains that this evidence was unduly prejudicial to his case as it allowed the jury to speculate that he was in the apartment complex prior to the rape and theft offenses. The appellant also contends that the trial court erred by refusing to hold a jury out hearing to determine the admissibility of this testimony.

### B. Analysis

#### 1. Jury-Out Hearing

During the trial, defense counsel continuously requested that the trial court hold hearings on matters relative to this evidence out of the presence of the jury. The trial court denied this request. Tenn. R. Evid. 104(c) provides that when the trial court must resolve evidentiary matters a hearing is appropriate. The rule further prescribes that a hearing held out of the presence of the jury is only mandated when the questioned evidence (1) involves the admissibility of a confession; (2) involves the testimony of the witness-accused; or (3) when required by the "interests of justice." See Tenn. R. Evid. 104(c); NEIL P. COHEN ET. AL., TENNESSEE LAW OF EVIDENCE, § 104.3. Absent such circumstances, the question as to whether a hearing out of the jury's presence is required is within the discretion of the trial court. See Advisory Commission Comments, Tenn. R. Evid. 104. As such, the trial court's

---

Business records are deemed reliable because they are prepared for other uses and are only incidentally prepared for purposes of litigation. See Henderson, 554 S.W.2d at 120 (quoting People v. Hobson, 119 N.W.2d 581, 588 (Mich. 1963)). The DNA analysis prepared in the present case was for no other purpose but this litigation, calling into question the report's reliability as a business record. See Hester, No. 03C01-9704-CR-00144.

refusal to conduct a jury out hearing in the present case was not an abuse of the court's discretion.

### 2. *Relevancy of Testimony Regarding Suspicious Vehicle*

The determination of whether proffered evidence is relevant in accordance with Tenn. R. Evid. 402 is left to the discretion of the trial judge, State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995), as is the determination pursuant to Rule 403, Tenn. R. Evid., of whether the probative value of evidence is substantially outweighed by the possibility of prejudice. State v. Burlison, 868 S.W.2d 713, 720-721 (Tenn. Crim. App. 1993). See also State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. Williamson, 919 S.W.2d at 78.

Relevant evidence is any evidence having a tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence. Tenn. R. Evid. 401. In certain circumstances, however, proffered evidence is logically relevant only if some other fact exists. That is, the relevancy of an item of evidence depends upon the existence of a particular preliminary fact. In such circumstances, the trial judge may admit such evidence conditioned upon the subsequent introduction of proof sufficient to support a finding of the particular preliminary fact. Tenn. R. Evid. 104(b). See also Tenn. R. Evid. 901. If the subsequent proof fails to establish relevancy, the conditionally admitted evidence must be stricken with an appropriate jury instruction. See Advisory Commission Comments, Tenn. R. Evid. 104.

At trial, Mrs. O'Kelley, a resident at the Georgian Woods Apartments, testified that, during the week prior to the offenses against Ms. Lightsey, she observed a

16

suspicious vehicle in her parking place outside of her apartment.  She stated that she saw a black male sitting in an unusual "blue M & M" color late model Cadillac. She also stated that she wrote the license plate number of the car on a piece of paper and turned it into the apartment manager, Mrs. Cutliff.  Mrs. Cutliff identified the piece of paper containing a license plate number that she gave to Officer Maxwell of the Memphis Police Department.

The testimony of Mrs. O'Kelley regarding the presence of an unusual color blue late model Cadillac occupied by a black male is only relevant to establish the identity of the appellant and his preparation for the instant offenses if the proof sufficiently connects the automobile and/or the identity of the driver to the appellant. The trial court, apparently, permitted the introduction of this testimony conditioned on the fact that the State would subsequently connect the suspicious automobile observed by Mrs. O'Kelley to the automobile owned by the appellant.  This connection was never made.

At trial, Mrs. O'Kelley was unable to identify the driver of the blue Cadillac parked in her parking place.  Additionally, the State failed to ask her whether the blue Cadillac observed at that time matched the blue Cadillac driven by the appellant; never attempted to introduce the piece of paper upon which she wrote the license plate number; and failed to asked her what license plate number she obtained from the suspicious blue Cadillac.  The State subsequently introduced the piece of paper through the testimony of Mrs. Cutliff and Officer Maxwell for purposes of identification only and, although Officer Maxwell testified that the license number recorded on the paper belonged to the vehicle owned by the appellant, the State, as noted by the trial court, failed to lay a proper foundation for this information.  The State never provided the proper foundation necessary to admit the paper into evidence and the trial court neglected to rule on its ultimate admissibility.  Thus, the paper was improperly considered as substantive proof by the jury.  See Tenn. R.

17

Evid. 901. Consequently, Mrs. Cutliff's and Officer Maxwell's testimony regarding the license plate number constituted hearsay and should not have been admitted. Tenn. R. Evid. 801 and 802. As such, the State failed to sufficiently connect the conditionally admitted evidence, *i.e.*, Mrs. O'Kelley's testimony, with the appellant's automobile. Accordingly, the trial court should have stricken Mrs. O'Kelley's testimony from the record and instructed the jury to disregard the same.

Regardless of the trial court's error in admitting the testimony, we conclude that, considering the legitimate testimony regarding DNA evidence identifying within a scientific certainty that the appellant was the perpetrator of the rape and the appellant's possession of the victim's jewelry, the error in admitting testimony regarding the suspicious blue car was harmless beyond a reasonable doubt and did not affect the outcome of the trial. Tenn. R. Crim. P. 52(a). This issue is without merit.

### III. Double Jeopardy

The indictment, in the present case, charged the appellant with two counts of theft of property over $1000. Specifically, Count One of the indictment charged the appellant of unlawfully and knowingly <u>obtaining property</u>, to wit: jewelry valued over $1000; and Count Two charged the appellant of unlawfully and knowingly <u>exercising control over property</u>, to wit: jewelry valued of $1000. The jury found the appellant guilty as to both counts. Upon review of the evidence and in order to find the evidence sufficient to support a guilty verdict on Count Two, we can reach no other conclusion than the same evidence was used to support both convictions.

The United States and Tennessee Constitutions protect the accused from being twice placed in jeopardy for the same offense. U.S. CONST. amend. V; TENN. CONST. Art. I, Sec. 10. As our supreme court has stated on many occasions, three

18

fundamental principles underlie the constitutional protections against double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense. See State v. Lewis, 958 S.W.2d 736, 738 (Tenn. 1997); State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996) (citing North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076 (1969)).

The instant case implicates the principle protecting against multiple punishments for the same offense. The double jeopardy concerns in the present case were not raised in the trial court. Although the general rule is that this court does not consider issues that are not raised in the trial court, plain error is a proper consideration for an appellate court whether properly assigned or not. State v. Hoyt, 928 S.W.2d 935, 946 (Tenn.Crim.App. 1995). Thus, we address the issue in order to correct an error of constitutional dimension and to prevent manifest injustice. Tenn. R. Crim. P. 52; Lewis, 958 S.W.2d at 738.

In 1989, all the prior forms of larceny, and all of the receiving and concealing stolen property offenses were combined into a single offense known as "theft of property."[9] State v. Hough, No. 03C01-9404-CR-00143 (Tenn. Crim. App. at Knoxville, June 13, 1995). Indeed, the new offense of theft "constitutes [but] a single offense embracing the separate offenses heretofore known as: embezzlement, false pretense, fraudulent conversion, larceny, receiving/concealing stolen property, and other similar offenses." See Tenn. Code Ann. § 39-14-101 (emphasis added).

Clearly, from the plain language of the theft offenses, theft by obtaining and theft by exercising control are the "same offense." Moreover, from the facts

---

[9]Under the pre-1989 Criminal Code, separate convictions for larceny and concealing stolen property arising from the same criminal transaction could not stand. See State v. Garland, 617 S.W.2d 176, 179 (Tenn. Crim. App. 1981).

19

presented at trial, the same evidence was used to support both counts. Thus, we conclude that the two separate convictions regarding the theft of jewelry from the victim's apartment constitute double jeopardy. As the appellant may only be convicted of one theft offense, the appellant's conviction and sentence for Count One: theft by obtaining is affirmed, however, the appellant's conviction and sentence for Count Two: theft by exercising control is vacated and dismissed.

## Conclusion

For the foregoing reasons, the appellant's convictions and sentences for aggravated rape and Count One theft of property by obtaining are affirmed. However, the appellant's conviction and sentence in Count Two for theft by exercising control is hereby dismissed and vacated as violative of constitutional protections against double jeopardy.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
JOE G. RILEY, Judge

_____
JOHN EVERETT WILLIAMS, Judge