IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2018 Session

## STATE OF TENNESSEE v. DARRELL WAYNE SMITH

**Appeal from the Criminal Court for Roane County**
**No. 2012-CR-167 Michael S. Pemberton, Judge**

_____

### No. E2017-00764-CCA-R3-CD

_____

The defendant, Darrell Wayne Smith, was convicted of driving under the influence and violation of the Tennessee Financial Responsibility statute. On appeal, the defendant contends he was denied a fair trial because the trial court issued a capias for his arrest in front of the jury. Additionally, the defendant contends the trial court erred in allowing portions of the State's expert's testimony and that the evidence is insufficient to support his convictions. On our review of the record and relevant authorities, the defendant is not entitled to relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Will Wooten, Kingston, Tennessee, for the appellant, Darrell Wayne Smith.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Russell Johnson, District Attorney General; and Joe Caldwell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

A Roane County Grand Jury indicted the defendant for driving under the influence and violation of the financial responsibility law as a result of a car accident. The defendant was charged based on his interactions with the state trooper at the scene and the results of a blood test indicating narcotics levels sufficient to cause impairment.

At the outset of the defendant's trial, the trial court opened court and announced to the jury panel that the parties were ready to proceed. After "a brief pause," the court officer informed the trial court "[the defendant is] not to be found." The State then asked the trial court to issue a capias for the defendant's arrest and revoke the defendant's bond. Trial counsel informed the trial court that he had spoken with the defendant the day before and the defendant knew to be in court. Trial counsel "attempted to contact [the defendant that] morning and was unable to reach him by phone." Trial counsel also advised the trial court that the defendant had "some medical issues," suggesting those issues could have caused his absence. The trial court granted the State's motion announcing, "A capias is going to be issued." The trial court ordered the defendant to be held without bond but told defense counsel "when you find out [he is] in there you get ahold of me promptly and [we will] schedule a quick hearing to determine if there was a wreck or if there was a physical [ab]normality or something like that."

The trial court then addressed the jury directly,

Ladies and gentlemen, obviously through no fault of . . . [c]ounsel the individual charged today has not appeared. So what we just did here was issue a capias, which is basically a warrant for his arrest. And . . . alright. [It is] a little [late is] all. But come back up.

As the trial court was addressing the jury, the defendant entered the courtroom. Upon seeing the defendant, the trial court held a bench conference, at the conclusion of which the trial court announced,

Alright ladies and gentlemen, Mr. Smith . . . you can come on up sir. I note that you're on crutches and I know that you came a long way today so certainly I'm not going to . . . I'm going to revoke my [o]rder and we will proceed. Come on up . . . I'll rescind my [o]rder.

The trial then proceeded and the jury heard the State's case-in-chief. On May 11, 2011, the defendant ran his vehicle off the road. Trooper Mathew Vespie, of the Tennessee Highway Patrol, responded to the call of an accident and found the defendant standing next to his vehicle. He asked the defendant if he had the vehicle registered or insured, and the defendant responded he did not, as he had just purchased the vehicle. Trooper Vespie's first impression was that the defendant was intoxicated. The defendant's eyes were blood-shot, red, and very watery. Additionally, the defendant's pupils were very constricted and his speech was slurred. Based on these observations, Trooper Vespie administered a series of field sobriety tests.

Trooper Vespie conducted the horizontal-gaze nystagmus test, the nine-step walk-and-turn, and the one-leg stand. The defendant failed the nine-step turn by failing to walk in a straight line, failing the turn, and losing track of the number of steps he had taken. The defendant failed the one-leg stand by switching legs mid-test and because he could not perform the test without looking straight ahead. During these tests, the defendant disclosed he had back surgery recently, had been prescribed Roxycodone, and would normally be using crutches. However, he claimed he had not taken any medication that day. Trooper Vespie admitted that a person's back, leg, or nerve problems could "hamper" the results of the walk-and-turn and one-leg stand tests because of issues with balance and coordination.

Given the defendant's possible medical issues, Trooper Vespie administered alternative field sobriety tests. Trooper Vespie asked the defendant to recite the alphabet without "singing it." The defendant failed this test, slurring his speech during his recitation. Additionally, Trooper Vespie administered the finger dexterity test, which the defendant also failed.

Based on the multiple failed field sobriety tests, Trooper Vespie took the defendant into custody. Trooper Vespie obtained the defendant's consent to take a blood sample and drove the defendant to the hospital. Shortly after placing the defendant in the back of the patrol car, Trooper Vespie noticed the defendant had fallen asleep. Trooper Vespie noted this was very unusual but consistent with the lethargy the defendant exhibited throughout their interaction.

The State's next witness was Special Agent Adam Gray, of the Tennessee Bureau of Investigation ("TBI"). Agent Gray, the Forensic Scientist Supervisor for the TBI's toxicology unit, was accepted as an expert in the areas of toxicology and chemistry. The trial court found Agent Gray "more than qualified" to testify about the results of the laboratory tests and to what the literature says are the therapeutic, sub-therapeutic, toxic, and lethal ranges for particular drugs and their metabolites. The trial court ruled Agent Gray could "testify as to the [defendant's] levels being above the therapeutic range and how much they were above the therapeutic range," but could not testify beyond that. The defendant objected to Agent Gray's use of the chart located in the article "Winek's Drug & Chemical Blood-level Data 2001" ("Winek chart") as inadmissible hearsay. The trial court overruled the defendant's hearsay objection to the Winek chart, stating Agent Gray could testify about the therapeutic ranges based on the literature because experts may rely on established literature, even when that literature would normally constitute inadmissible hearsay.

Agent Gray testified the defendant tested positive for Oxycodone, NorDiazepam, and Alprazolam, depressants that can cause muscle weakness, confusion, tiredness, and

lack of coordination. Agent Gray testified the pharmaceutical industry uses different levels to describe the amount of a particular drug in the blood. Agent Gray utilized the Winek chart to illustrate the ranges in which concentrations of a particular drug are classified as either therapeutic, toxic, or lethal. The therapeutic level is where a medication is having the effect intended by the prescribing doctor; however, Agent Gray noted, an individual can still be impaired while in the therapeutic level. The toxic level is where a medication shows more of its adverse effects. Agent Gray also noted the Winek chart will often list generic versions of certain medication separately from the name brand version of the medication; e.g., Ambien, the name brand version of Zolpidem, is listed separately with different concentration levels than generic Zolpidem. Agent Gray stated that he also utilized other charts in determining whether the concentration of medication in the defendant's blood was above or below the therapeutic range but did not specify the specific names of those charts.

Agent Gray testified that the amount of Oxycodone in the defendant's blood, 260 nanograms per milliliter ("ng/ml"), was more than double the upper range of the therapeutic level on the Winek chart (10 ng/ml to 100 ng/ml) and more than a quarter higher than the upper range (200 ng/ml) on another chart. The defendant had 8.4 ng/ml of NorDiazepam in his blood which is below the therapeutic level for NorDiazepam (400 ng/ml). Finally the amount of Alprazolam in the defendant's blood, 75.6 ng/ml, was within the therapeutic range on the Winek chart (25 to 102 ng/ml) and over the therapeutic level on a second chart (20 to 60 ng/ml).

Agent Gray testified the drugs detected in the defendant's blood are central nervous depressants and can cause impairment. Agent Gray further noted prescription bottles for these types of drugs warn that they should not be taken with other central nervous depressants and that one should avoid operating a motor vehicle while taking these medications. Common side effects of these medications are "sleepiness," "drowsiness," "lethargy," and "weakness." Agent Gray agreed many things affect an individual's response to a medication, including how long one has been on the medicine. Agent Gray agreed the levels set forth in the charts do not show when a person is impaired and agreed he could not testify, based on the blood test, that the defendant was impaired. Agent Gray testified, however, that the average half-life of Oxycodone is three to six hours and that he would expect the defendant's numbers to be lower if he had taken the medication the night before.

The jury found the defendant guilty of both driving under the influence and violating the financial responsibility statute. The trial court sentenced the defendant to eleven months and twenty-nine days for driving under the influence, suspended after serving forty-eight hours in confinement, and imposed a fine and trial court costs for the

financial responsibility violation. The defendant filed a timely motion for new trial, which the trial court denied. This timely appeal followed.

## *Analysis*

On appeal, the defendant argues his convictions should be overturned for three reasons. First, the trial court prejudiced the defendant by issuing a capias for his arrest in the presence of the jury. Second, the trial court erred by allowing Agent Gray to testify and utilize the Winek chart. And third, the evidence is insufficient to support the jury's verdict for driving under the influence and violation of the Tennessee Financial Responsibility statute.

### 1. Issuance of the Capias Warrant

The defendant contends the issuance of the capias in the presence of the jury made it impossible for him to receive a fair and impartial trial. The State argues the defendant waived review of this issue for failing to contemporaneously object. Furthermore, the State contends the defendant is not entitled to plain error review as the defendant has failed to establish how the issuance of the capias affected a fundamental right of the defendant. Based on our review of the record and relevant authorities, we agree with the State.

The trial court's order denying the motion for new trial states, "the court inquired as to whether the parties wished to go ahead and proceed with the trial, given what had just transpired in front of the jury venire. The defendant did not object and agreed to proceed. As the defendant failed to raise this issue at trial; therefore, we review solely for plain error. *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016) (stating that failure to raise an election of offenses issue in the trial court waives direct appellate review but does not preclude plain error review). The doctrine of plain error applies when all five of the following factors have been established:

(a) The record must clearly establish what occurred in the trial court;
(b) A clear and unequivocal rule of law must have been breached;
(c) A substantial right of the accused must have been adversely affected;
(d) The accused must not have waived the issue for tactical reasons; and
(e) Consideration of the error must be "necessary to do substantial justice."

*State v. Page*, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Id*. at 231. Complete consideration of all

the factors is not necessary when it is clear from the record that at least one of these factors cannot be established. *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000).

Here, the defendant has failed to establish a substantial right was adversely affected. While every defendant is entitled to a fair and impartial trial, we are not persuaded that right was infringed. The defendant argues the issuance of the capias was tantamount to giving the jury an impression he was in the custody of or otherwise restrained by the State. The defendant relies upon *Willocks v. State*, 546 S.W.2d 819 (Tenn. Crim. App. 1976), and *State v. Braden*, 874 S.W.2d 624 (Tenn. Crim. App. 1993), in support. However, these cases are not persuasive in the instant case. Unlike the defendants in *Willocks* and *Braden*, the defendant was never under the control or restraint of the State. In the moments that elapsed from the issuance of the capias to the revocation of the order, the defendant had no restraints placed on his liberty.

The defendant argues whether or not he was not physically restrained is irrelevant because the jury was given the impression he would be arrested and detained at some point in the future. However, that alone is insufficient to damage the defendant's presumption of innocence. "Jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance," it is impossible to eliminate from trial procedures "every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct." *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Carroll v. State*, 532 S.W.2d 934, 937 (Tenn. Crim. App. 1975). Here, as soon as the defendant entered the courtroom, the trial court, in the jury's presence, acknowledged the defendant was not only impaired by crutches but also by the distance he had to travel to get to trial. The trial court then immediately rescinded its order and proceeded to trial. While not an explicit curative instruction, the trial court, in the jury's presence, absolved the defendant of any wrongdoing for his tardiness. These actions are sufficient to ensure the defendant's presumption of innocence was not infringed. Therefore, the defendant is not entitled to review of this issue.

### 2. Agent Gray's Testimony

The next question before the Court is whether the trial court abused its discretion in allowing Agent Gray to testify to the "therapeutic, toxic, or lethal" drug levels found in the defendant's blood. The defendant contends Agent Gray was not qualified to testify concerning the drug levels found in the defendant's blood because Agent Gray does not have a medical degree and could not testify to the studies used to create or support the Winek chart. The defendant also contends the Winek chart in and of itself constituted inadmissible hearsay and could not be relied upon, regardless of Agent Gray's qualifications. The State argues Agent Gray was thoroughly voir dired before offering his testimony and given Agent Gray's extensive experience, the trial court did not abuse

its discretion. Additionally the State notes experts may rely on inadmissible hearsay in forming their opinion and the Winek chart is a document normally relied on within the field. Upon our review of the record, we agree with the State.

The trial court accepted Agent Gray as an expert in the areas of toxicology and chemistry. The trial court found Agent Gray "more than qualified" to testify about the results of the laboratory tests and to what the literature says are the therapeutic, toxic, and lethal ranges for particular drugs. The trial court ruled Agent Gray could "testify as to the [defendant's] levels being above the therapeutic range and how much they were above the therapeutic range," but could not testify beyond that.

It is well-established that questions regarding the admissibility, relevancy, and competency of expert testimony are left to the broad discretion of the trial court. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). "We may not overturn the trial court's ruling admitting or excluding expert testimony unless the trial court abused its discretion." *Brown*, 181 S.W.3d at 273; *see also McLeod*, 937 S.W.2d at 871. A trial court abuses its discretion "when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Scott*, 275 S.W.3d 395, 404-405 (Tenn. 2009) (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)).

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007); *Brown*, 181 S.W.3d at 273. Rule 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

When determining the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to give an opinion within the limits of the witness's expertise. *Scott*, 275 S.W.3d at 402; *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002). "The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." *Stevens*, 78 S.W.3d at 834. A trial court "may make a finding of reliability if the expert's conclusions are sufficiently straightforward and supported by a rational explanation which reasonable [persons] could accept as more correct than not correct." *Id.* (internal quotation marks omitted).

The record supports the trial court's decision to accept Agent Gray as an expert witness in the areas of toxicology and chemistry. Agent Gray is a 14-year employee of the TBI and serves as the Forensic Scientist Supervisor for the toxicology unit. Agent Gray obtained a Bachelor of Science degree in chemistry, received on-the-job toxicology training from a senior forensic toxicologist, performed outside proficiency analysis, and attended seminars and webinars on new techniques and technologies in toxicology and forensic science. Agent Gray reviewed literature and scientific articles on toxicology, the effects of drugs on individuals, and the specific effects of drugs on individuals who are driving or performing field sobriety tests. He has attended classes on opioids and the effects of drug use; and seminars and webinars where doctors presented on the therapeutic levels of drugs. Agent Gray has testified in 60 criminal trials in the area of drug chemistry, testified in 35 to 40 trials in the area of toxicology, and been qualified as an expert in federal court and in trial courts of Knox, Hamilton, and Sullivan counties. The trial court, therefore, did not abuse its discretion in determining Agent Gray was qualified to testify regarding whether the drugs found in the defendant's blood were at therapeutic or toxic levels, based on established research.

Furthermore, Agent Gray's use of the Winek chart did not violate the rules against hearsay nor did it fail to meet the reliability standards of Rule 703 of the Tennessee Rules of Evidence. An expert witness may base his or her opinion on "(1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field." *State v. Kennedy*, 7 S.W.3d 58, 66 (Tenn. Crim. App. 1999) (citing Tenn. R. Evid. 703). Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. *See* Tenn. R. Evid. 703. Indeed, it is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence, but are reliable. *See Kennedy*, 7 S.W.3d at 66 (citing Neil P. Cohen et al., Tennessee Law of Evidence § 703.4). In determining the reliability of the underlying information, the underlying data must be such that experts in that field reasonably rely on them in forming the same kinds of opinions or inferences that the expert in this case did. *Id.* Therefore, Tennessee Rule

of Evidence 703 provides that an expert may base an opinion upon clearly inadmissible hearsay, if the type of hearsay is one that would be reasonably relied upon by experts in the field.

Agent Gray testified the Winek chart is regularly relied on by experts in his field. Agent Gray explained the chart relies on studies from across the field of toxicology but the primary study underlying the Winek chart is *Drug Effects on Psychomotor Performance*, by Basalt. This study is widely used in the field, cited regularly in scientific articles, and referenced at toxicology seminars. From this testimony, it is apparent the trial court did not err in concluding Agent Gray not only had sufficient knowledge of the underlying studies of the Winek chart, but also that the Winek chart is a source reasonably relied upon by experts in the field of toxicology.

The thrust of the defendant's argument is that the jury chose to accredit Agent Gray's testimony, despite inconsistencies within the Winek chart and his inability to reference its underlying studies. However, the defendant was able to cross-examine Agent Gray about the chart, his conclusions based on the chart, and his knowledge of the underlying studies. The trial court properly instructed the jury as to the weight they were to give to the expert's testimony. The jury chose to accredit Agent Gray and resolved all issues of credibility in favor of the State. Because it is within the province of the jury to resolve issues of credibility and determine the value of the evidence presented, we will not reevaluate the jury's accreditation on appeal. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Moreover, even if Agent Gray's testimony is inadmissible, any error in permitting him to testify is harmless based on the overwhelming evidence presented at trial. It is undisputed the defendant ran his vehicle off the road. The jury heard testimony from Trooper Vespie indicating the defendant failed all field sobriety tests administered, slurred his speech, and was lethargic. Trooper Vespie testified that, in his professional experience, the defendant's behavior was consistent with impairment. Additionally, the defendant admitted to Trooper Vespie he had taken medication within the past 24 hours. Even without Agent Gray's testimony, there is sufficient evidence to support a jury's conclusion the defendant was driving under the influence. The defendant, therefore, is not entitled to relief.

3. Sufficiency of the Evidence

The defendant argues the evidence is insufficient to support the jury's verdicts. He claims the testimony of the State's two witnesses was insufficient to establish the defendant was impaired. Additionally, he argues the State failed to present sufficient evidence to support a finding that the defendant violated the Financial Responsibility

statute. When the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with

guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

### a. Driving Under the Influence

An individual is guilty of driving under the influence if in "physical control of any automobile . . . on any of the public roads and highways of the state . . . while [u]nder the influence of any . . . drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess." Tenn. Code Ann. § 55-10-401. It is undisputed the defendant had been driving an automobile on a public road in the State of Tennessee.

The State presented evidence that, during the middle of the day, the defendant ran his vehicle off the road despite no visible obstructions or hazards. The defendant had slurred speech, bloodshot and watery eyes, and "very constricted" pupils. The defendant failed all field sobriety tests, even after Trooper Vespie offered alternative tests to account for the defendant's back surgery. When attempting the walk-and-turn test the defendant stepped off the line, did not touch heel to toe, stopped walking, could not remember how many steps to take, and did not turn properly. The defendant put his foot down during the one-leg stand test, changed legs, had to look straight ahead, could not do more than one thing at a time, and went off-balance each time he looked at his toe. Finally, the defendant could not follow instructions on the alphabet test nor successfully complete the finger dexterity test.

The defendant's blood was positive for Oxycodone, NorDiazepam, and Alprazolam. Oxycodone is a Schedule II controlled substance, while NorDiazepam and Alprazolam are Schedule IV controlled substances. Tenn. Code Ann. §§ 39-17-408(b)(1)(M); -412(c)(1), (41). The jury heard testimony that indicated the levels of these drugs were either within or over the therapeutic range which could cause impairment. Oxycodone, NorDiazepam, and Alprazolam are central nervous depressants that can have impairing effects such as muscle weakness, confusion, tiredness, and lack of coordination; users are advised against taking multiple central nervous depressants simultaneously because doing so can affect their ability to drive.

The defendant argues Trooper Vespie improperly administered the tests and did not account for the defendant's back problems. However, that does not address the sufficiency of the evidence but speaks instead to Trooper Vespie's credibility. As noted supra, it is the role of the jury to resolve issues of credibility. The jury chose to accredit

Trooper Vespie's conclusion the defendant was impaired and resolved all conflicts in favor of the State. *See Bland*, 958 S.W.2d at 659. Viewed in the light most favorable to the State, the evidence is sufficient to support the jury's verdict for driving under the influence. The defendant is not entitled to relief on this issue.

### b. Financial Responsibility

To sustain the defendant's conviction for failing to present proof of financial responsibility, the State must have proven beyond a reasonable doubt that the defendant failed to provide evidence of financial responsibility with respect to a vehicle driven on a state highway. Tenn. Code Ann. § 55-12-139. Documentation of an insurance policy is one of the necessary aspects of proof for financial responsibility. *Id.* The law states that on or before the defendant's court date, he may submit evidence that he was in compliance with the financial responsibility law at the time of the offense and have the charge of failure to provide evidence of financial responsibility dismissed. *See State v. Tony A. Pitts*, No. M2009-01177-CCA-R3-CD, 2010 WL 2867193, at *2 (Tenn. Crim. App. July 22, 2010), *perm. app. denied* (Tenn. Oct. 20, 2010).

The State presented evidence indicating the defendant's vehicle was not registered or insured at the time of the accident. The defendant argues Trooper Vespie did not actually ask the defendant to produce proof of insurance; however, this argument is not supported by the record. Trooper Vespie stated during his cross-examination, "I said, 'Do you have it registered or insurance?' [The defendant] said, 'No. This is a new car I just got.'" While Trooper Vespie admitted he did not ask for proof of insurance again, the initial exchange is sufficient to satisfy the requirements of the statute. *See* Tenn. Code Ann. § 55-12-139(b)(1)(A) ("[T]he officer shall request evidence of financial responsibility as required by this section . . ."). The defendant never produced evidence that at the time of the accident he possessed insurance sufficient to satisfy the statutory requirement. Therefore, the evidence is sufficient to support the jury's verdict for violation of the financial responsibility law, and the defendant is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
J. ROSS DYER, JUDGE