**FILED**

09/20/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 15, 2019 Session

**STATE OF TENNESSEE v. TEVIN MANTEZ HARRIS**

**Appeal from the Circuit Court for Robertson County
No. 2013-CR-776   Jill Bartee Ayers, Judge[1]**

_____

**No. M2018-00638-CCA-R3-CD**

_____

A Robertson County Circuit Court Jury convicted the Appellant, Tevin Mantez Harris, of second degree murder and possession of a firearm with the intent to go armed, and the trial court sentenced him to concurrent sentences of twenty-two years to be served at one hundred percent and eleven months, twenty-nine days, respectively.  On appeal, the Appellant contends that the trial court erred by allowing witnesses to testify about his being Muslim and his "viewpoint" toward Christianity and that his twenty-two-year sentence is excessive because the trial court misapplied an enhancement factor.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

James Harwell Todd (on appeal), Nashville, Tennessee, and Chase T. Smith (at trial), Clarksville, Tennessee, for the appellant, Tevin Mantez Harris.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In November 2013, the Robertson County Grand Jury indicted the Appellant for the first degree premeditated murder of Thomas Smith, possession of a firearm with the

_____

[1] Judge Ayers did not preside over the Appellant's trial or sentencing hearing.

intent to go armed, and resisting arrest. Although the Appellant does not contest the sufficiency of the evidence, we will summarize the proof presented at trial in order to address the issues raised.

Twenty-two-year-old Veronica Miles testified that she grew up with the victim, who was a few years older than she, and that they were "close." Miles knew the Appellant and knew the Appellant and the victim had an ongoing disagreement about their religions. A couple of weeks before the victim's death, Miles arranged for the Appellant and the victim to meet because the victim "didn't want to have any more beef" with the Appellant. On the day of the meeting, the Appellant and Miles drove to pick up the victim. The victim and his friend, Montavious Ellis, got into the car, and the Appellant and the victim started talking. Miles stated that the Appellant "got loud" and that the victim told the Appellant, "I won't disrespect you [anymore]." The victim and Ellis got out of the car, and the Appellant told Miles that he was going to kill the victim if the victim said "[f***] Allah" again. Miles said that she did not see the victim or Ellis with a gun that day but that the Appellant had a chrome gun on his lap. The Appellant and the victim did not shake hands after the meeting.

Miles testified that on Sunday, October 13, 2013, she was at Vicci Dowlen's house on Leota Street. Other people, including the Appellant and the victim, also were there because Dowlen cooked food on Sundays. The Appellant "started getting loud" and told the victim that "you keep disrespecting me, I told you to stop disrespecting me, but you are still doing it." The victim tried to leave through the kitchen but the Appellant blocked him, and they continued arguing back and forth. They went into the living room, and Miles was standing by a wall in the room. The Appellant had a gun on his left hip, so the victim lifted up his shirt to show he did not have a gun in his waistband. Miles said that the Appellant and the victim pushed each other and that the Appellant started "jumping up and down." The Appellant then "hopped into a circle" and "was ranting . . . like he done got possessed or something[.]" By the time the Appellant turned around, "he had his gun out and he shot [the victim] in the stomach."

Miles testified that the victim and the Appellant were two to three feet apart at the time of the shooting and that the Appellant shot the victim with the same chrome gun she had seen on the day of the meeting. The victim fell backward, and the Appellant said, "Die, bitch, die." Miles stated that the Appellant was smiling after the shooting, that he ran out of the house, and that he left in a car.

On cross-examination, Miles testified that the Appellant never threatened the victim "to his face." She acknowledged that the Appellant and the victim were "in each other's faces" and were pushing each other prior to the shooting but denied that the victim "charge[d] at" the Appellant. She also acknowledged that a man named Jeremy

Hudson tried to stop the argument. The victim pushed Hudson out of the way and then pushed the Appellant more than one time. The Appellant turned around, pulled out the chrome gun, and shot the victim.

Montavious Ellis testified that he and the victim were cousins and grew up together. At the time of the shooting, Ellis was twenty-four years old, and the Appellant was twenty-seven. Ellis had known the Appellant for "quite a long time," and they were friends "over the years." Ellis stated that he was present for the meeting between the Appellant and the victim a couple weeks prior to the shooting and that the victim "was trying to just get rid of the problem that was going on." Ellis described the problem as "[s]omething about a Muslim Allah." The victim did not have a gun during the meeting, but the Appellant had "[k]ind of like a .9" on his hip. Ellis said that the Appellant and the victim "came to an agreement" and shook hands after the meeting and that he thought their problem was over.

Ellis testified that on the day of the shooting, he and the victim went to Vicci Dowlen's house because Dowlen sold plates of food on Sundays. A lot of people, including "little kids," were at the house when they arrived, and a man was applying tattoos for money. Ellis said that he and the victim were talking when the Appellant came into the house and that the Appellant's gun was on the Appellant's hip. The Appellant saw a man named Michael Nelson getting a tattoo of some crosses on his chest, and the Appellant told Nelson, "God was a Muslim, God was brainwashed." Nelson seemed to know something was about to happen, so he picked up his child and walked away from the Appellant.

Ellis testified that the Appellant went toward the victim. The victim saw the gun on the Appellant's hip, lifted his shirt, and told the Appellant, "I don't have a gun. If anything, let's fight." The Appellant walked up to the victim and pushed him, and the victim pushed the Appellant back "to protect himself." Ellis said the Appellant "[spun] around there, his Muslim dance or whatever" and pulled out his gun. The victim "raise[d] his hands up," and the Appellant fired one or two shots at the victim. The victim fell, and the Appellant said, "Look at you now, die, bitch." The Appellant walked slowly out of the house, lit a cigarette, got into a car, and pulled away.

On cross-examination, Ellis denied that Jeremy Hudson tried to intervene in the argument before the shooting. He also denied that the victim pushed Hudson away and that the victim "charged back" toward the Appellant. Ellis acknowledged that he was a convicted felon and on probation at the time of the Appellant's trial. He said he had not entered into any agreement with the State in exchange for his testimony.

Jeremy Hudson testified that the victim was his best friend. Hudson "kind of grew up with [the Appellant] too," and they also were friends. On October 13, 2013, Hudson was at Vicci Dowlen's house. The victim and Montavious Ellis arrived after Hudson, and the Appellant arrived after the victim and Ellis. Hudson said the Appellant "come in and got to [whooping] and hollering about religion or whatever." Hudson, who was getting a tattoo in the dining room, heard the Appellant and the victim arguing in the living room. Hudson said he heard "[s]omething about - anybody don't like [Allah], I'm going to smack them[.]" About two minutes later, Hudson heard a gunshot.

Hudson testified that after the shooting, he saw the Appellant holding a gun and walking out of the house. The victim crawled into the dining room, and Hudson and some other people put him into a car and drove him to a hospital. However, the victim died in Hudson's arms before they arrived. Hudson never saw the victim with a gun.

On cross-examination, Hudson acknowledged that he had known the victim to carry a gun and to be a member of the Crips gang. He denied getting involved in the argument on October 13, trying to "break up" the argument, or pushing the victim away from the Appellant. He acknowledged telling the police that he heard two gunshots. On redirect-examination, though, Hudson testified that he remembered hearing only one gunshot.

Thirty-nine-year-old Vicci Dowlen testified that she grew up around the victim's mother and that she watched the victim grow up. Dowlen also knew the Appellant when he was a child, but she was not around him as much as the victim. In 2013, Dowlen cooked dinner and sold plates of food at her home every other Sunday. Everyone from the neighborhood was welcome, and the victim and Montavious Ellis usually came to buy plates.

Dowlen testified that on October 13, 2013, she cooked Sunday dinner. She also had a man at her house applying tattoos, which was unusual. Thirteen or fourteen people, including children, came to her home, and the victim and Ellis were there. Everyone was getting along, and some people were drinking alcohol. Michael Nelson had just gotten a tattoo of a cross on his chest, and Dowlen sat in the tattoo chair to get a tattoo on her neck. Dowlen heard the Appellant come into the house and heard him tell Nelson, "[F***] that cross." Nelson told the Appellant that he "didn't want to hear that." Dowlen said that the victim "stepped in" and that she heard the victim tell the Appellant that "you are not going to disrespect my Auntie's house." The victim was referring to Dowlen. Dowlen stated that the victim and the Appellant got into a "heated argument" and that they were "just talking about the cross and the religion and Allah and all that."

Dowlen testified that she told the "tattoo man" to stop applying her tattoo and that she got out of the chair to see what was going on. The Appellant and the victim were standing by the front door and were two or three feet apart. Dowlen said the Appellant did "some kind of twirl in the air," aimed a gun at the victim, and fired one gunshot into the victim's chest. The Appellant said "something [about] Allah" and walked out the door. The victim was still alive and stated, "Cuz, don't let me die." Some people put him into a car and drove him to a hospital.

On cross-examination, Dowlen acknowledged that she did not hear any problems when the Appellant first arrived and that she did not hear anyone tell him to leave. The Appellant began arguing with Nelson, and the victim intervened. Jeremy Hudson grabbed the victim and tried to get him out the door, but the victim pushed Hudson. Dowlen said she did not see the Appellant block the victim from leaving and acknowledged that she saw the victim "get into [the Appellant's] face."

Dowlen repeatedly denied telling the police that the victim did not believe in God. Therefore, the trial court allowed defense counsel to read her written statement to the police to the jury. In the statement, which Dowlen gave on the day of the shooting, Dowlen said she thought the Appellant and the victim were arguing about religion because the Appellant was a Muslim and the victim did not believe in God. Dowlen also told the police that she heard two gunshots. Dowlen acknowledged to the jury that she had two prior felony convictions.

On redirect examination, Dowlen testified that her felony convictions were for failure to appear and driving on a revoked license. Moreover, at the time of the Appellant's trial, she was on probation for driving under the influence. Regarding the number of gunshots she heard, Dowlen explained that when the victim fell back from the gunshot, a painting on the wall hit the stove, "so it sounded like a shot too."

Kimora Gardner, the victim's cousin, testified that she had known the Appellant about one year at the time of the shooting. On October 13, 2013, she was at Dowlen's house, and they were getting ready to have a "tattoo party." During the party, Gardner left the home for about ten minutes. Gardner passed the Appellant on her way out and asked him, "[W]hat's up[?]" The Appellant did not respond. While Gardner was gone, she received a telephone call from the Appellant. He asked her, "Was I wrong?" Gardner did not know what he was talking about and asked, "Wrong for what?" The Appellant told her, "I don't want Cuz to die. I do care about that." Gardner returned to Dowlen's house, found crime scene tape around it, and went to the hospital. She later telephoned the Appellant and told him that he had killed the victim. The Appellant told her that he was sorry and hung up.

Officer Joe MacLeod and Detective Rickie Morris of the Springfield Police Department (SPD) testified that they responded to the shooting. Detective Morris went in the front door of Dowlen's home and found one shell casing near a couch and one bullet near an "entertainment area." Detective Charles Bogle of the SPD testified that the Appellant was developed as a suspect in the shooting. On October 15, the police received "a tip" about the Appellant's location and went to a home on Grace Street. Detective Bogle looked through a window and saw the Appellant sitting on a couch. The Appellant stood up and "took off running." Police officers entered the home, secured the residence, and "deployed teargas." Detective Madison Burnett of the SPD testified that the Appellant came out of the basement and that the police arrested him. Detective Burnett searched the house and found a Ruger semi-automatic pistol under the couch.

Steve Scott, a special agent forensic scientist with the Tennessee Bureau of Investigation, testified as an expert in firearms identification that he examined a nine-millimeter shell casing, a fired nine-millimeter bullet, and a Ruger nine-millimeter semi-automatic pistol that were recovered as evidence in this case. Based on Agent Scott's microscopic examination of the evidence, he concluded that the shell casing had been fired from the pistol. The bullet may have been fired from the pistol, but Agent Scott could not say so conclusively. Agent Scott also examined the t-shirt the victim had been wearing at the time of the shooting. One entry hole was in the shirt's mid-chest area, and one exit hole was in the shirt's lower back. Based on gunshot residue around the entry hole, Agent Scott concluded that the muzzle of the gun was six to twenty-four inches from the shirt when the gun was fired.

Dr. Adele Lewis from the Chief Medical Examiner's Office in Nashville testified as an expert in forensic pathology that she performed the victim's autopsy on October 14, 2013. The victim had a gunshot entrance wound a few inches above his belly button and a gunshot exit wound in his left lower back. The bullet damaged the victim's mesentery, a large artery and vein in his pelvis, and a bone in his spine and caused "a great deal" of internal bleeding. Dr. Lewis acknowledged that the victim could have died within a few minutes of the shooting. The victim's blood was positive for small amounts of marijuana and alcohol. Dr. Lewis concluded that his cause of death was a gunshot wound to the torso.

At the conclusion of Dr. Lewis's testimony, the State rested its case. The Appellant made a motion for a judgment of acquittal as to all three counts, and the trial court granted his motion as to count three, resisting arrest. The Appellant did not present any evidence, and the jury convicted him of second degree murder, a Class A felony, as a lesser-included offense of first degree premeditated murder and as charged of possession of a firearm with the intent to go armed, a Class A misdemeanor. After a sentencing

hearing, the trial court sentenced him to concurrent sentences of twenty-two years and eleven months, twenty-nine days, respectively.

## II. Analysis

### A. Witness Testimony

The Appellant claims that the trial court erred by allowing Vicci Dowlen, Montavious Ellis, Veronica Miles, and Jeremy Hudson to testify about his being Muslim and his viewpoint toward Christianity because the probative value of the evidence was substantially outweighed by its prejudicial effect. The Appellant concedes that his and the victim's ongoing feud about religion was relevant to his motive to shoot the victim but contends that any testimony about his specific religious beliefs and negative views on Christianity was not needed in order for the State to prove its case. The State argues that the trial court did not abuse its discretion by ruling the evidence was admissible. We agree with the State.

Before trial, the Appellant filed a motion to preclude the State from eliciting any testimony about his religious beliefs because the testimony was irrelevant. At a hearing on the motion, Veronica Miles testified about the meeting in the car a couple of weeks before the shooting. She stated that during the meeting, the Appellant and the victim had a "discussion/argument" in which the Appellant told the victim "not to disrespect Allah." The victim agreed with the Appellant and told the Appellant that "we [are] going to make it better." The Appellant had a gun in his hand during the meeting. However, the victim, who was sitting behind the Appellant, never saw the gun, and the Appellant never threatened him with it. Miles said that after the meeting, the Appellant told her that he was going to kill the victim "if [the victim] says [f***] Allah again."

Miles testified that on October 13, 2013, the Appellant and the victim were at Dowlen's house and began yelling about "[t]heir religion." The Appellant told the victim, "I done told you, I done told you, stop disrespecting Allah." The victim told the Appellant that he "didn't care about Allah, [f***] Allah." The Appellant and the victim started pushing each other, and the Appellant started jumping up and down. The Appellant turned around in a circle and shot the victim.

On cross-examination, Miles acknowledged that the victim did not believe in God. She also acknowledged that he "got in [the victim's] face and said F Allah again" prior to the shooting.

Montavious Ellis testified that a few weeks before the shooting, he and the victim were walking on Blair Street when the Appellant and Veronica Miles pulled up in a white

- 7 -

car. The victim "wanted to quash" his dispute with the Appellant, so the victim and Ellis got into the car. The Appellant and the victim talked for ten or fifteen minutes, and the Appellant did not say anything "bad" to the victim. Ellis said that the Appellant and the victim shook hands and that Ellis thought "that was the end of it."

Ellis testified that on October 13, 2013, the Appellant came into Dowlen's house and saw Michael Nelson with two crosses tattooed on his chest. Ellis said the Appellant told Nelson that "God was a Muslim and he needed to take it off of him. God was brainwashed and all type of stuff like that." The Appellant then started an argument with the victim. The Appellant "got in [the victim's] face," and the victim pushed the Appellant away. Ellis stated that the victim pushed the Appellant again and that the Appellant "jumped in the air and did some kind of spin move or whatever you call it, I don't know, Allah this and shot [the victim] twice[.]" On cross-examination, Ellis testified that the victim was "a firm believer in God" and went to church whenever he got a chance.

Jeremy Hudson testified that on October 13, 2013, he heard the Appellant and the victim arguing in Dowlen's living room and that he thought the argument was about "religion, something about Allah and Jesus Christ or whatever. . . . [The victim] was on Jesus side, and [the Appellant] was on Allah side." Hudson heard a gunshot, the victim crawled into the dining room, and the victim said, "Cuz, help me." On cross-examination, Hudson denied that the victim did not believe in God. He acknowledged that the victim did not attend church but said that "you don't have to go to church to believe in God."

Vicci Dowlen testified that on the night of the shooting, Michael Nelson got a tattoo, and the Appellant "made his way" to Nelson. Nelson and the Appellant began "talking about the cross that [Nelson] had just got," and the Appellant told Nelson, "F that cross." Dowlen said that the victim "started taking up for Nelson" and that the Appellant and the victim got into an argument in the living room about "[t]he cross, their religions, Christ." The argument escalated, and Dowlen started walking toward the living room to see what was going on. She said the Appellant jumped into the air, said "something Allah," and shot the victim one time. After the shooting, the Appellant again said "something Allah" and got into a car.

On cross-examination, Dowlen testified that she did not see the Appellant and the victim push each other. However, she acknowledged that they were "in each other's face."

At the conclusion of the hearing, defense counsel argued that the probative value of the "Muslim [v]ersus Christianity thing" was substantially outweighed by its

prejudicial effect and that the State could still show the Appellant's motive for the killing by having the witnesses testify that the Appellant and the victim "were in an argument over religious beliefs." The State acknowledged that the Appellant's and the victim's argument was "over basically religion." However, the State asserted that preventing the witnesses from testifying about the Appellant's and the victim's specific statements to each other did not give the jury a "fair picture" of what happened. The State noted that the Appellant told Veronica Miles a couple of weeks before the shooting that he was going to shoot the victim if the victim disrespected Allah again, which showed the Appellant's intent to shoot the victim on October 13. The trial court agreed with the State that the evidence was relevant. The trial court also found that the probative value of the testimony was highly relevant to the Appellant's intent to kill the victim and was not substantially outweighed by the danger of unfair prejudice. At trial, Dowlen, Ellis, Miles, and Hudson testified about the specific statements the Appellant and the victim made to each other regarding their religious views.

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." State v. Pylant, 263 S.W.3d 854, 870 (Tenn. 2008). The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Turning to the instant case, the witnesses' testimony established that the dispute between the Appellant and the victim was much more than a simple disagreement over their religious beliefs. Instead, their testimony showed that the two men were in an ongoing feud in which the Appellant thought the victim was disrespecting his being Muslim and Allah. Moreover, their feud had escalated to the point where the Appellant told Veronica Miles a couple of weeks before the victim's death that he was going to kill the victim if the victim said "f*** Allah" again. The victim did just that on October 13, 2013. Therefore, the evidence was highly relevant to the Appellant's motive and intent to kill the victim.

- 9 -

Moreover, we agree with the trial court that the probative value of the evidence was not substantially outweighed by its prejudicial effect. In fact, the evidence may have been helpful to the Appellant. Through the witnesses, the State established that the Appellant was very passionate about his Muslim beliefs and that the victim was well-aware of the Appellant's passion. The testimony also established that the victim knew the Appellant was upset with him for disrespecting the Appellant's religion and that the victim wanted to meet with the Appellant to resolve their disagreement. During the meeting, the victim told the Appellant that he was going to stop disrespecting Allah and make his relationship with the Appellant "better." Despite the victim's assurances, the victim again said "f*** Allah" to the Appellant just before the shooting. Ellis testified that the Appellant told her a couple of weeks before the shooting that he was going to kill the victim if the victim said "f*** Allah" again. While the Appellant's declaration of an intent to kill the victim, his use of a deadly weapon on the unarmed victim, and his calmness immediately after the crime were factors that demonstrated premeditation, the jury chose to convict him of second degree murder as a lesser-included offense of first degree premeditation murder. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Therefore, we conclude that the trial court properly determined that the probative value of the evidence was not substantially outweighed by its prejudicial effect.

We note that in support of his argument that the testimony was highly prejudicial, the Appellant refers to jury voir dire during which the following colloquy occurred between defense counsel and one of the prospective jurors, who was a church pastor:

> [DEFENSE COUNSEL]: [Prospective juror], are you familiar with practicing Muslims?
>
> JUROR: Yes.
>
> [DEFENSE COUNSEL]: Okay, do you ever preach against Muslims?
>
> JUROR: Have, yes.
>
> [DEFENSE COUNSEL]: So you have preached against them. So, if it comes out in the proof that [the Appellant] is a Muslim, then you would hold that against him, right? Because I mean, you have preached against him?
>
> JUROR: Not against him as an individual. I disagree with the theology behind it, but I do not judge them individually.

> [DEFENSE COUNSEL]: But would that keep you from being fair and impartial?
>
> JUROR: No.

The prospective juror stated that he had preached against Muslims, but the prospective juror was not a member of the jury. Furthermore, although the other prospective jurors in the courtroom heard the exchange, the prosecutor and defense counsel questioned all of them about whether they could be fair and impartial to the Appellant's religion. None of the prospective jurors indicated that they had any bias toward Muslims. Accordingly, we conclude that the Appellant is not entitled to relief.

## B. Excessive Sentence

The Appellant claims that his twenty-two-year sentence is excessive because the trial court misapplied an enhancement factor. The State argues that the trial court properly applied the factor and that, in any event, misapplication of the factor does not warrant relief. We agree with the State.

At the sentencing hearing, the State introduced the Appellant's presentence report into evidence and had two witnesses testify: the mother of the victim's girlfriend and the victim's mother. Both of the witnesses testified that the victim was a loving and attentive father to his two children, who were one and three years old at the time of his death. The Appellant gave a statement in which he apologized to the victim's family.

At the conclusion of the hearing, the trial court noted that second degree murder was a Class A felony and that the Appellant was facing a sentence of fifteen to twenty-five years as a Range I, standard offender. The court found that the following enhancement factors applied to the Appellant's conviction of second degree murder: (9), that the defendant possessed or employed a firearm during the commission of the offense; (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high"; and 13(F), that at the time the felony was committed, the defendant was on some form of judicially ordered release. See Tenn. Code Ann. § 40-35-114(9), (10), (13)(F). The trial court found that no mitigating factors applied. The trial court ordered that the Appellant serve concurrent sentences of twenty-two years for second degree murder[2] and eleven months, twenty-nine days for possession of a firearm with the intent to go armed.

---

[2] Pursuant to statute, the Appellant was required to serve one hundred percent of the sentence for second degree murder in confinement. See Tenn. Code Ann. § 40-35-501(i)(1), (2)(B).

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on an appellant to demonstrate the impropriety of the sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

On appeal, the Appellant contests the trial court's application of enhancement factor (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." He contends that while the State's proof showed that multiple people were in Vicci Dowlen's house at the time of the shooting, the proof did not show that any person other than the victim was in danger. In support of his argument, he notes that he shot the victim only one time and at close range. He further contends that because only two enhancement factors were applicable, the trial court's increasing his punishment from the minimum fifteen years to twenty-two years was excessive.

Enhancement factor (10) is inherent in every homicide in relation to the named victim; however, "the trial court may consider this factor when the defendant endangers the lives of people other than the victim." State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000). The trial court found that enhancement factor (10) applied in this case because the shooting occurred "in a room full of people."

Dowlen and Miles testified that the shooting occurred in the living room, and Miles said she was standing by a wall in the room. Therefore, while the room may not have been "full of people," at least one person was in the room with the Appellant and the victim at the time of the shooting. Moreover, the bullet traveled completely through the victim. Accordingly, we cannot say that the trial court misapplied enhancement factor (10).

In any event, as our supreme court has explained, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . . So long as there are other reasons consistent with the purposes and principles of sentencing,

as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." <u>Bise</u>, 380 S.W.3d at 706. The Appellant does not contest the application of two enhancement factors. Therefore, we conclude that the trial court did not abuse its discretion in determining the length of the Appellant's sentence.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE